**FOOD FAIR STORES, INC., Plaintiff,**

v.

**FOOD DRIVERS, HELPERS AND WAREHOUSEMEN LOCAL NO. 500, et al., Defendants.**

**Civ. A. No. 73–1949.**

United States District Court,
E. D. Pennsylvania.

Sept. 7, 1973.

John B. Nason, III, Philadelphia, Pa., for plaintiff.

Edward B. Bergman, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

Defendants Food Drivers, Helpers and Warehousemen Local 500 (Union), Striking and Picketing Members and certain officials of Union, removed this action pursuant to 28 U.S.C. § 1441(a) (1970) from the Court of Common Pleas of Philadelphia County, Pennsylvania. Original jurisdiction is premised on § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1970) in that the complaint in state court alleges a violation of a collective bargaining agreement. In the state court the plaintiff employer, Food Fair Stores, Inc. (Food Fair) had obtained on August 28, 1973 a preliminary injunction enjoining the defendant union and its members from refusing to return to work. The state court injunction expired by its terms on September 4, 1973. On plaintiff's motion for a preliminary injunction, made after removal of the action from state

court, we held a hearing on September 5, 1973 to determine whether the subject matter of the dispute between the parties precipitating the work stoppage of August 28 was over a grievance both parties were bound to arbitrate. Boys Market, Inc. v. Retail Clerk's Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); Avco Corporation v. Local Union No. 787, 459 F.2d 968 (3rd Cir. 1972); Parade Publications, Inc. v. Philadelphia Mailers Union No. 14, 459 F.2d 369 (3 Cir. 1972). This memorandum serves as our findings of fact and conclusions of law as required by Fed. R.Civ.P. 52.

The parties to this action are signatories to a collective bargaining agreement which expires on December 31, 1973. Article 28, § 5 of the agreement prohibits "work stoppages or threats thereof." Article 8, § 1 provides: "Grievances involving disputes concerning the application of [sic] interpretation of the express terms of this Agreement shall be handled in the manner provided for by this Article." The grievance procedure provided for in Article 8 culminates in binding arbitration (Art. 8, § 7). Article 8, § 6 limits the arbitrator's power as follows: "The arbitrator's decision must be within the scope and express terms of this Agreement and shall not change any terms or conditions thereof." Finally, the Protection of Rights Article of the agreement (Article 10) provides:

It shall not be a violation of this Agreement and it shall not be a cause for discharge or disciplinary action in the event an employee refuses to enter upon any establishment, warehouse or retail market where a lawful primary picket line has been established at such premises and such picket line has received the approval and sanction of Teamsters Joint Council No. 53 of Philadelphia and Vicinity.

It is upon the latter provision, Article 10, that the Union seeks to justify the walkout of August 28.

Food Fair operates a Warehouse and Food Distribution Center at 11th and Pattison Avenue, Philadelphia, Pennsylvania. There are approximately 550 persons employed by Food Fair at the Distribution Center. Approximately 200 of these employees are truck drivers and members of the Food Drivers, Helpers and Warehousemen Local 500. Another 300 warehousemen are members of Teamsters Local 169. Some 50 employees are mechanics and also members of Local 500. Each of these employee groups are covered by separate contracts with Food Fair. The action before us involves those employees who are members of Local 500. Finally, there are 11 other employees at the Distribution Center who are not unionized. Seven of these 11 persons perform jobs generally referred to as dispatchers. The other four persons are clerks. There exists a dispute between the parties over whether the dispatchers are supervisory or employee personnel. The union contends that these dispatchers and clerks are employees, and thus covered by the National Labor Relations Act. Food Fair contends that the dispatchers are supervisors and thus not entitled to the benefits of unionization provided for in the NLRA.

Sometime between midnight and one in the morning of August 28 defendant William Brown, Secretary Treasurer for Local 500, in the company of defendants Thomas Davis and James Polizzi approached John Batti, the Operating Manager of The Trucking Division for Food Fair. Brown presented Batti, who was not on duty at the time but had received a telephone call that there was some trouble at the Center, with eleven authorization cards signed by seven of the dispatchers and four clerks. Ostensibly the authorization cards were a method whereby Local 500 sought representation of the dispatchers and clerks. The strategy of presenting the cards to Batti at a time near midnight of August 28 had been arranged by Brown early August 27th at a meeting with a number of the dispatchers. Even though Brown thought the cards should not be presented until some time later,

Brown's position was in complete accord with the others who wished to confront Batti with the cards. Brown knew before he presented the authorization cards to Batti that Batti did not have authority and would not be able to grant recognition of Local 500 as representative for the dispatchers and clerks. When Batti was unable to grant recognition of Local 500, the dispatchers set up a picket line at the Food Distribution Center. The existence of the picket line resulted in the work stoppage by the employee members of Local 500 which is the matter now before us.

The Union argues that the subject matter of the dispute between the parties is whether members of Local 500 can refuse to cross the picket line established by the dispatchers as part of the defendants' effort to give support to the dispatchers in their attempt to gain recognition. The refusal to cross the picket line is asserted to be protected by Article 10 of the agreement. The evidence is clear, however, that the use of the picket line by the dispatchers was merely an attempt to provide a shield for the efforts of Local 500 to force the employer to agree to resolve certain pre-existing grievances between the parties which are clearly subject to arbitration under the contract. A review of the evidence establishes this point.

■ We credit Mr. Batti's testimony that Brown had said at the early morning meeting of August 28th that "this [the picketing and subsequent work stoppage] will give me a chance to clean all my problems in one sweep." Brown's testimony that his arrival at the scene on August 28th was unplanned is simply not credible. Defendants' own witnesses testified that the confrontation with Batti was prearranged. It is also clear from the defendants' testimony that the dispatchers had left their jobs before Brown appeared and were quite prepared for the setting up of a picket line and a walk out. Finally, the August 13, 1973 meeting called by Brown established Brown's major concern with the

pre-existing grievances between the parties. At the August 13th meeting Brown requested the presence of some of the more important management persons in Food Fair, persons who are not ordinarily involved in settling grievances. Among those requested to be present was the Vice President in charge of distribution. At the meeting Brown enumerated some five unresolved grievances and notified the company that if the grievances were not resolved favorably for the Union a strike would be called within 30 days. The evidence clearly establishes that this threat became a reality on August 28, and that the issue of recognition of the dispatchers was merely an attempt to shield any work stoppage from a court restraining order. We find that the grievances presented at the August 13th meeting are the subject matter of the dispute between the parties causing the work stoppage of August 28th. The grievances presented at the meeting of August 13th included: (1) a dispute concerning breach of the Produce Agreement between the parties, (2) use of contract carriers to ship goods, (3) a dispute over the handling of frozen food, and (4) the hauling of meat from Linden, N.J. to the N.J. shore. All these disputes involve matters clearly subject to arbitration under the collective bargaining contract.

In addition, we find that the picketing engaged in on August 28 was not approved or sanctioned by Teamsters Joint Council No. 53 of Philadelphia and Vicinity as required by Article 10 of the collective bargaining agreement between the parties. Thus Art. 10 cannot be used to validate defendants' action.

■ Defendant Union contends, however, that Art. 10 insulates the August 28th walkout from any restraining order of this court. Despite the finding that the Union has not even complied with Art. 10, we think it clear that even if the Union had fully complied with Art. 10 that Article would not in all cases insulate the Union's conduct in refusing to

work. It is clear that in providing for recognition of lawful picketing the parties contemplated good faith disputes which result in the establishment of a picket line. To give Art. 10 an interpretation such as to allow work stoppages over disputes clearly subject to arbitration simply because others are willing to use the picket line to support economic pressure to settle arbitrable grievances would make a mockery of the arbitration process.

Thus, our finding that the picket line in this case was not set up in support of a bona fide dispute over recognition of the dispatchers and clerks, but in an effort to press resolution of arbitrable grievances distinguishes this case from Amstar Corporation v. Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, 468 F.2d 1372 (5 Cir. 1972). In Amstar it was clear that the strike by union members other than those covered by the collective bargaining agreement was a bona fide strike and not merely an attempt to resolve arbitrable disputes between parties to the agreement.

In finding that the picket line in this case was established merely to avoid the arbitration process of the contract, we need not consider Food Fair's contention that the effect of the picket line clause is itself a matter subject to arbitration. We must, however, consider the remaining contention advanced by the Union that Food Fair's conduct in suspending the dispatchers and clerks who picketed precludes equitable relief on Food Fair's behalf.

The Union contends that Food Fair's indefinite suspension of the dispatchers and clerks involved in the August 28th picketing is an unfair labor practice which should result in the denial of an injunction for Food Fair. The argument is premised on § 8 of the Norris-LaGuardia Act, 29 U.S.C. § 108 (1970) which prohibits injunctive relief to any "complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." We must consider the viability of this section in light of the Boys Market decision.

It seems clear that certain portions of the Norris-LaGuardia Act governing the issuance of injunctions in labor disputes has survived the Boys Market decision. Boys Market makes clear that Norris-LaGuardia was not being repealed by allowing federal courts to issue injunctions in labor disputes over arbitrable controversies. Rather the Court in Boys Market mandates an accommodation between § 301 of the Labor Management Relations Act and Norris-LaGuardia. A number of Circuit Courts have held that certain portions of the Norris-LaGuardia Act have survived Boys Market. See United States Steel Corp. v. United Mine Workers of America, 456 F.2d 483 (3 Cir. 1972); Emery Air Freight Corporation v. Local Union 295, 449 F.2d 506 (2d Cir. 1971), cert. denied, 405 U. S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972). As Judge Gibbons has stated:

In expressly overruling its earlier decision in Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), and in approving the analysis of the Sinclair dissent, the Supreme Court worked out a careful and narrow accommodation between the earlier Norris-LaGuardia Act and the later Labor-Management Relations Act. It held only that the express prohibitions against certain specific injunctions contained in § 4 of Norris-LaGuardia, 29 U.S.C. § 104, were deemed not to bar injunctions necessary to accomplish the purposes of the Labor-Management Relations Act through contract arbitration. The Court very carefully in Part V of the opinion, 398 U.S. at 253–255, 90 S.Ct. 1583, made clear that it was dealing only with the prohibitions of §

4 of Norris-LaGuardia, and then only in cases where the court first holds that a strike is over a grievance which both parties are contractually bound to arbitrate. The opinion says nothing about the procedural steps which must be taken in making that determination or about the safeguards which must surround the issuance of a preliminary injunction.

United States Steel Corporation v. United Mine Workers of America, 456 F.2d *supra* at 487.

■ Given the applicability of § 8 to these proceedings, we conclude that plaintiff is not therefore precluded from obtaining an injunction. The dispute before us concerns grievances which, we have held, are clearly subject to arbitration under the contract. The plaintiff seeks arbitration of these grievances and our order will require that these grievances be arbitrated. Since we have found that the use of the picket line was simply a shield by the defendants to avoid arbitration, plaintiff cannot be faulted for seeking such arbitration. Plaintiff has not shirked any duty imposed by law, nor has he failed to make every reasonable effort to settle the grievances with the defendants by means of the method prescribed by the contract. Section 8 does not, therefore, bar relief.

Finally, the plaintiff has satisfied the requirements otherwise necessary for the issuance of a preliminary injunction including substantial likelihood of success on the merits and the existence of irreparable harm to which the parties have stipulated.

### ORDER

Now, this 7th day of September, 1973, upon amended complaint and affidavit filed by counsel for plaintiff, following hearing on plaintiff's motion for a preliminary injunction and upon findings by the Court that:

1. The plaintiff and defendant Union are parties to a collective bargaining agreement.

2. The collective bargaining agreement between plaintiff and defendant Union prohibits strikes and work stoppages during the life of the agreement.

3. Defendants have engaged in a strike or work stoppage in violation of the no-strike provisions of the collective bargaining agreement.

4. The collective bargaining agreement between plaintiff and defendant Union provides a grievance procedure which binds both parties to arbitration.

5. The strike or work stoppage of defendants was based on (1) the alleged failure of plaintiff to abide by the Produce Agreement between the parties, (2) the use of contract carriers to ship goods, (3) a dispute concerning the handling of frozen food, and (4) a dispute concerning the hauling of meat from Linden, New Jersey to the New Jersey Shore. Defendant Union's grievances concerning these matters are subject to the grievance and arbitration provisions of the collective bargaining agreement.

6. Plaintiff is ready and willing to proceed with arbitration over the issues enumerated in paragraph 5 of this Order in accordance with the grievance and arbitration provisions of the collective bargaining agreement.

7. Substantial immediate and irreparable injury, loss and damage will result to plaintiff by reason of the actions of defendants.

8. Plaintiff has no adequate remedy at law.

9. As to each item of the relief granted herein, greater injury will be inflicted upon plaintiff by the denial of said relief than will be inflicted upon defendants by the granting of

said relief and any harm to defendants will be adequately indemnified by bond filed herein.

It is ordered and decreed that defendant Union, and the individual defendants, individually and collectively, the members of defendant Union, its officers, agents, servants, representatives and employees, individually and collectively, and all other persons acting in concert with or otherwise participating in their aid are enjoined from doing the following acts or any one of them:

(a) Refusing to order the employees of plaintiff to refrain from engaging in any stoppage of work, interruption or disruption of operations over the issues enumerated in paragraph 5 of this Order.

(b) Engaging in any stoppage of work, interruption or disruption of operations over the issues enumerated in paragraph 5 of this Order.

(c) Taking any action or pursuing any course of action which is intended to, or has the effect of violating, interfering with or disturbing the duties of employees of plaintiff under and pursuant to their collective bargaining agreement as long as that agreement is in effect over the issues enumerated in paragraph 5 of this Order.

(d) From picketing, carrying signs, stating employees are on strike, and/or otherwise inducing or permitting or in any other manner interfering with persons attempting to enter or leave the premises of plaintiff over the issues enumerated in paragraph 5 of this Order.

It is further ordered and decreed:

(1) Plaintiff submit to arbitration of the grievances in question in accordance with the grievance and arbitration provisions of the collective bargaining agreement.

(2) Plaintiff shall enter security in the amount of One Thousand Dollars.