SOUTHERN OHIO COAL COMPANY et al., Plaintiffs-Appellees,

v.

UNITED MINE WORKERS OF AMERICA et al., Defendants,

Local Union No. 1957, etc., Defendant-Appellant.

SOUTHERN OHIO COAL COMPANY et al., Plaintiffs-Appellants,

v.

UNITED MINE WORKERS OF AMERI-CA et al., Defendants-Appellees (three cases).

SOUTHERN OHIO COAL COMPANY et al., Plaintiffs-Appellees,

v.

UNITED MINE WORKERS OF AMERICA et al., Defendants,

Local Union No. 1890 et. al., Defendants-Appellants.

SOUTHERN OHIO COAL COMPANY et al., Plaintiffs-Appellants,

v.

UNITED MINE WORKERS OF AMERICA et al., Defendants,

Local Union No. 1890 et. al., Defendants-Appellees.

Nos. 75–2392 to 75–2396 and 76–2031.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 18, 1976.

Decided Feb. 11, 1977.

John W. Kenesey, Clayman & Jaffy, Columbus, Ohio, for appellants in Nos. 75–2392 and 75–2396, and appellees in Nos. 75–2393 to 75–2395, and 76–2031.

Willard P. Owens, Washington, D. C., for U. M. W.

Alvin J. McKenna, Alexander, Ebinger, Holschuh, Fischer & McAlister, D. Michael Miller, Columbus, Ohio, for appellees in Nos. 75–2392 and 75–2396, and appellants in Nos. 75–2393 to 75–2395, and 76–2031.

Before PHILLIPS, Chief Circuit Judge, and WEICK and CELEBREZZE, Circuit Judges.

CELEBREZZE, Circuit Judge.

This case arose from a series of work stoppages at three coal mines owned by the Ohio Power Company and operated by the Southern Ohio Coal Company [1]—Meigs No. 1, Meigs No. 2 and Raccoon No. 3. The miners employed at these mines are members of Locals 1890, 1886 and 1957 of the United Mine Workers of America. The Southern Ohio Coal Company and the United Mine Workers are signatories of the National Bituminous Coal Wage Agreement of 1974. On April 14, 1975, the Company filed an amended complaint in the Southern District of Ohio seeking injunctive relief and damages for breach of the mandatory arbitration provision in the collective bar-

---

1. For the sake of clarity, we will refer to Appellants throughout the opinion as "the Company."

gaining agreement.[2] Jurisdiction was based on § 301(a) of the National Labor Management Relations Act. 29 U.S.C. § 185(a)(1970). Named as defendants were Locals 1890, 1886 and 1957, District No. 6 and the United Mine Workers of America. The amended complaint alleged that the members of the unions were engaged in a continuing practice of striking over arbitrable grievances in violation of the no-strike pledge implied from the mandatory arbitration clause. The complaint also alleged that the strikes had been condoned and encouraged by District No. 6 and the United Mine Workers of America.

The District Court denied the initial motions for preliminary injunctions because the particular work stoppage had ceased, but the Court warned defendants that future work stoppages during the pendency of the action could result in injunctive relief for the employer. On May 28th, the employees at Raccoon No. 3, who are members of Local No. 1957, failed to report for work. The work stoppage was occasioned by the assignment of a supervisor to whom the miners objected. On June 2d, the members of Local No. 1957 again failed to report for work. This time the strike was set off by a computer error that shortchanged a number of miners' pay checks. On June 19th, the District Court granted a preliminary injunction against Local 1957 but refused to extend the order to the district and international unions. The Court found that the May 28th and June 2d work stoppages resulted from disputes over arbitrable grievances and thus violated the union's no-strike obligation. The Court also found that these work stoppages were only the latest of a series of strikes over arbitrable

disputes where the miners failed to file grievances but simply closed the mine for a short period. The Court noted that the Company was ready and willing to arbitrate the grievances. Finally, the Court concluded that the injunction was warranted by ordinary principles of equity because the Company was suffering irreparable injury from the repetitious work stoppages and would suffer more from the denial of the injunction than would the union from its granting. The District Court ordered Local 1957:

> To refrain from engaging in any further work stoppage at Raccoon No. 3;
>
> To refrain from committing, doing, uttering, writing, or communicating, any word, act, or deed, written, spoken or performed which is intended, designed or calculated to induce, persuade, order, cause or bring about the failure or refusal of any member of the defendant to report for work or to work at Raccoon No. 3;
>
> To utilize the grievance and arbitration procedures of the National Bituminous Coal Wage Agreement of 1974, with respect to arbitrable grievances; and
>
> To take all action which may be necessary to assure compliance with the terms of the National Bituminous Coal Wage Agreement of 1974.

On August 19, 1975, mine workers at all three mines failed to report for their shifts. As a result the Company sought preliminary injunctions against Locals 1886 and 1890, District No. 6 and the UMW International.[3] The Court found that these work stoppages were primarily attributable to the Company's distribution of a document entitled "Guidelines for Dealing with Mine

---

2. Article XXIII, § (c) of the National Bituminous Coal Wage Agreement of 1974 provides as follows:

   Should differences arise between the Mine Workers and the Employer as to the meaning and application of the provisions of this Agreement, or should differences arise about matters not specifically mentioned in this Agreement, or should any local trouble of any kind arise at the mine, an earnest effort shall be made to settle such differences at the earliest practicable time.

The section goes on to describe a five-step procedure, culminating in arbitration, established for the purpose of resolving all disputes arising between the parties.

3. Although work had also ceased at Raccoon No. 3, Local 1957 was not made a party to the proceedings, presumably because of the injunction already in effect. Nor did the Company seek to have Local 1957 cited for contempt of the June 19th decree.

Health and Safety Committee" to its supervisory personnel. The Court also indicated that the presence of stranger pickets at the mine sites and the shooting of a member of Local 1886 contributed to the August 18th work stoppage. As before, the Court noted that no grievances had been filed over the incidents and found that the work stoppages were over arbitrable issues and thus in violation of the implied no-strike agreement. The Court stated that the Company had "amply demonstrated a pattern of activity by the local union which does, in fact, reflect disregard of the contractual provisions of the National Bituminous Coal Wage Agreement and which further shows a probability that the local unions will continue such work stoppages whenever they again become dissatisfied over some conditions of work at the mine." Concluding that the equities supported issuance of preliminary injunctions against Locals 1886 and 1890, the District Court entered orders identical to the decree imposed on Local 1957. Once again, however, the Court refused to enjoin the district and international unions.

In late July of 1976, the mines were again closed. This time the shut down was caused by the miners' refusal to cross stranger picketlines set up at the mine sites by unidentified pickets. The Company viewed the miners' refusal to cross the picketlines as a violation of the outstanding injunctions, and motioned the Court for orders to show cause why the local unions should not be held in contempt. The District Court denied the motions feeling itself bound by the decision of the Supreme Court in *Buffalo Forge Co. v. United Steelworkers of America*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), which had been decided in the interim since the injunctions were issued. The District Court reasoned that the miners' refusal to cross was protected activity and not subject to injunction. The

Court concluded the order denying the motions with the statement that "*Buffalo Forge* casts a shadow upon the breadth of the injunctions issued June 19th and September 9, 1975, and at a minimum requires under the present circumstances the denial of Plaintiffs' motions for orders to show cause." The Company appeals from the Court's refusal to enjoin the district and international unions and from the denial of the motions for orders to show cause. The local unions challenge the issuance of the preliminary injunctions and contend, *inter alia*, that the orders are vague and overbroad.

A logical starting point for review of injunctions restraining work stoppages growing out of a labor dispute is the Supreme Court's decision in *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). In *Boys Markets* the Supreme Court overruled its previous decision in *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), and held that, despite the prohibitory language of § 4(a) of the Norris-LaGuardia Act,[4] federal courts in the exercise of § 301 jurisdiction had the power to issue injunctions to restrain strikes over arbitrable disputes in violation of express or implied no-strike agreements. The *Boys Markets* Court adopted the standards suggested in the *Sinclair* dissenting opinion for the exercise of a court's equitable powers to enjoin a strike:

"A District Court entertaining an action under § 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract

4. No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from

doing, whether singly or in concert, any of the following acts:

(a) Ceasing or refusing to perform any work or to remain in any relation of employment.

29 U.S.C. § 104 (1970).

*does* have the effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance." 370 U.S., at 228, 82 S.Ct. 1328. (Emphasis in original.) 398 U.S. at 254, 90 S.Ct. at 1594, *quoting Sinclair Refining Co. v. Atkinson,* 370 U.S. at 228, 82 S.Ct. 1328. (Brennan, J., dissenting).

■ The unions claim that the preliminary injunctions were invalidly issued because the District Court failed to follow the *Boys Markets* formula. Specifically, they argue that the work stoppages were caused by non-arbitrable disputes and that the District Court did not properly weigh the equities between the parties.[5] After reviewing the record, we affirm the findings of the District Court that the work stoppages which led to the preliminary injunctions centered around issues that the unions were contractually bound to arbitrate under the Bituminous Coal Wage Agreement of 1974. Nor can we conclude that the District Court abused its discretion in balancing the equities between the parties. The record does not support the locals' allegations of "bad faith" and "unclean hands" on the part of the Company. The District Court properly applied the *Boys Markets* guidelines and concluded that principles of equity supported issuance of the injunctions.

■ We also must reject the Company's contention that the District Court erred in refusing to extend the injunctions to District No. 6 and the UMW International. The District Court conceded that the District and International had notice of the work stoppages on August 13, 1975, and of earlier work stoppages, but held that mere notice was not sufficient to justify extending the injunctions to those parties. The Court found that neither the District or the International had instigated or provoked the current work stoppages. These findings are not clearly erroneous. The Company argues that this Court should follow ordinary principles of agency law and hold the District and International liable for the "mass action" of their members and for failing to use all "reasonable means" at their disposal to end the unauthorized strikes. While these agency theories have been met with favor by some courts, *see e.g., Eazor Express, Inc. v. Intern'l Brotherhood of Teamsters,* 520 F.2d 951 (3d Cir. 1975), they have not been well received by this Court. As we recently reaffirmed in *Peabody Coal Co. v. Local Unions,* 543 F.2d 10, 12 (6th Cir. 1976), there is no authority in this circuit for the proposition that a union may be held responsible for the "mass action" of its members in staging an unauthorized strike or for failure to use its "best efforts" in curtailing one. On the contrary, this Court has repeatedly held that a union may only be held responsible for the authorized or ratified actions of its officers and agents. *See e.g., North American Coal Corp. v. Local 2262, UMW,* 497 F.2d 459, 466–67 (6th Cir. 1974). There may be occasions where a union's studied ambivalence toward an unauthorized strike may constitute sufficient inducement, encouragement and condonation of the strike to expose the union to injunctive relief and damages, *see Riverton Coal Co. v. United Mine Workers of America,* 453 F.2d 1035, 1042 (6th Cir. 1972), this generally arises where there are facts on record to suggest that the union was allowing the wildcat strike to continue to bring pressure to bear on the employer and reap the benefits of the illegal work stoppage without outwardly violating its contractual commitments. Since the record does not disclose that the District and International encouraged, condoned or induced

---

**5.** For discussion of the unions' allegation that the Court's failure to order the Company to arbitrate requires vacation of the injunctions see text at 28 *infra.*

the strikes, either through action or inaction, those parties were properly excluded from the preliminary injunctions.

■ The Company claims that the District Court erred in declining to order the local unions to show cause why they should not be held in contempt for refusing to cross the stranger picketlines set up at the mine sites. Relying on the Supreme Court's decision in *Buffalo Forge Co. v. United Steelworkers of America, AFL–CIO,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022, (1976), the District Court concluded that the locals' refusal to cross the picketlines was not enjoinable and therefore could not be the basis for contempt citations. Because we agree with the District Court that the matter is controlled by *Buffalo Forge,* we find no error in the denial of the motions for orders to show cause.

In *Buffalo Forge* the employer's plants were struck by "office clerical-technical" (O & T) employees who were in the midst of collective bargaining negotiations. The production and maintenance (P & M) employees at the struck plants refused to cross the O & T picketlines. Both groups of employees were represented by the United Steelworkers of America. The P & M employees were working under contracts which provided for the arbitration of grievances, including disputes over the interpretation and application of the contract. The contracts also contained express no-strike clauses. The employer brought a § 301(a) action against the United Steelworkers and the locals representing the P & M employees alleging that the P & M work stoppage violated the no-strike agreement and that the question of whether the no-strike clauses had been violated was arbitrable under contractual procedures for settling disputes over the interpretation and application of each contract. The District Court denied injunctive relief, and the Second Circuit affirmed, holding that the P & M employees were engaged in a "sympathy strike" which was outside the narrow exception to the Norris-LaGuardia Act recognized in *Boys Markets.* The Supreme Court agreed with the result reached by the lower courts and

held that it would be improper to enjoin the P & M employees' strike pending the arbitrator's decision on the scope of the no-strike clauses in the contracts. 428 U.S. at 412, 96 S.Ct. 3141, 49 L.Ed.2d 1022. The Court distinguished a sympathy strike from the typical *Boys Market* situation because refusal to cross another's picketline is not precipitated by an underlying dispute which the parties have agreed to submit to arbitration:

> *Boys Markets* plainly does not control this case. The District Court found, and it is not now disputed, that the strike was not *over* any dispute between the Union and the employer that was even remotely subject to the arbitration provisions of the contract. The strike at issue was a sympathy strike in support of sister unions negotiating with the employer; neither its causes nor the issue underlying it were subject to the settlement procedures provided by the contract between the employer and respondents. The strike had neither the purpose nor the effect of denying or evading an obligation to arbitrate or of depriving the employer of his bargain. Thus, had the contract not contained a no-strike clause or had the clause expressly excluded sympathy strikes, there would have been no possible basis for implying from the existence of an arbitration clause a promise not to strike that could have been violated by the sympathy strike in this case. 428 U.S. at 408, 96 S.Ct. at 3147.

Conceding that the issue of whether the sympathy strike violated the no-strike clause was arbitrable, the majority resisted the suggestion that district courts were empowered to enjoin alleged breaches of no-strike agreements despite the express prohibition of § 4(a) of the Norris-LaGuardia Act. The majority expressed the fear that acceptance of the employer's argument would involve federal courts in a wide range of arbitrable disputes and allow the judiciary to usurp the role of the arbitrator and interfere with the private contractual relationship of the parties:

> If an injunction could issue against the strike in this case, so in proper circum-

stances could a court enjoin any other alleged breach of contract pending the exhaustion of the applicable grievance and arbitration provisions even though the injunction would otherwise violate one of the express prohibitions of § 104. The court in such cases would be permitted, if the dispute was arbitrable, to hold hearings, make findings of fact, interpret the applicable provisions of the contract and issue injunctions so as to restore the status quo *ante* or to otherwise regulate the relationship of the parties pending exhaustion of the arbitration process. This would cut deeply into the policy of the Norris-LaGuardia Act and make the courts potential participants in ·a wide range of arbitrable disputes under the many existing and future collective-bargaining contracts, not just for the purpose of enforcing promises to arbitrate, which was the limit of *Boys Markets*, but for the purpose of preliminarily dealing with the merits of the factual·and legal issues that are subjects for the arbitrator and of issuing injunctions that would otherwise be forbidden by the Norris-LaGuardia Act. 428 U.S. at 410, 96 S.Ct. at 3148. (footnotes omitted).

The Company contends that there are significant differences between the work stoppages in this case and the "sympathy strike" in *Buffalo Forge*. It claims that the stranger pickets whose presence triggered the work stoppages were dissident West Virginia coal miners who are roving through the coal fields shutting down mines as an extension of an illegal strike begun at the Cedar Coal Company's mines in Kanawa County, West Virginia. Although the District Court did not expressly identify the stranger pickets, we are willing to assume for purposes of this opinion that the stranger picketlines were established by a roving band of mine workers engaged in an illegal strike at another mine. However, we do not accept the assumption proposed by the

Company that the local unions by respecting the stranger picketlines somehow ratified the illegal West Virginia strike and adopted its goals as their own. The record does not support such a proposition. The Company attempts to distinguish the sympathy strike in *Buffalo Forge* from the refusal to cross in this case by contending that in *Buffalo Forge* the primary pickets and the sympathy strikers were members of different bargaining units, whereas in this case the stranger pickets and the local miners are all members of the same bargaining unit working under a single national contract. Thus, the employer reasons, the membership of the local unions stands to benefit from resolution of the primary strike favorable to the mine workers. Just why this is so the Company does not elaborate. By claiming that the local miners have adopted the goals of the illegal strike, without being explicit as to their nature, the Company is asking this Court to conclude that this is not really a refusal-to-cross situation but a case where the locals have joined an illegal primary strike over arbitrable issues—a paradigm case for a *Boys Markets* injunction. This we decline to do. The Bituminous Coal Wage Agreement provides that local disputes be grieved and arbitrated on a mine-by-mine basis.[6] The only benefit to be derived by the local unions from favorable settlement of the West Virginia strike is indirect, at best, and highly speculative. Accordingly, the bare assertion that all mine workers are members of the same bargaining unit and working under a national contract adds little to the central inquiry in *Boys Markets* cases— whether the employees sought to be enjoined are striking over issues which they have agreed to arbitrate. We cannot conclude on the present state of the record that the locals' refusal to cross the stranger picketlines amounted to ratification of and active participation in an illegal strike.[7]

**6.** National Bituminous Coal Wage Agreement, Act XXIII, § (c). By appeal to the Arbitration Review Board, conflicting decisions of local arbitrators may be harmonized. However, we are not persuaded that the mere possibility of

central review by the Board significantly strengthens the Company's argument.

**7.** *Compare Food Fair Stores, Inc. v. Food Drivers Local 500*, 363 F.Supp. 1254, 1256 (E.D.Pa. 1973). *See* Abrams, *The Labor Injunction and*

Nor do we believe that the legality or illegality of the primary picketing is a valid basis for distinguishing *Buffalo Forge*. The Company contends that a court must issue an injunction against a union which refuses to cross an illegal picketline or else it sanctions open support of illegal conduct. The Company claims it would be anomalous to regard a secondary strike as non-enjoinable when it is in support of a primary strike which is illegal, and hence enjoinable. The glaring defect in this argument is that it improperly shifts the focus of the court's inquiry from the employees against whom the injunction is sought to the illegal pickets. Not only does this raise problems of proof because the initial strikers will often not be parties to the action, but it also places the burden of making complex judgments as to the legality of the primary line on the employees faced with the decision whether or not to cross. If they refuse to cross, they run the risk of injunction, damages and civil contempt. Both *Boys Markets* and *Buffalo Forge* teach quite explicitly that the proper focus of judicial attention in a § 301(a) injunctive action should be on the employees sought to be enjoined. The "narrow exception" to the Norris-LaGuardia Act perceived in *Boys Markets* may only be invoked where the union defending the action has struck "over a grievance which both parties are contractually bound to arbitrate." 398 U.S. at 254, 90 S.Ct. at 1594. As the Supreme Court reiterated in *Buffalo Forge*, "there is no general federal anti-strike policy." 428 U.S. at 409, 96 S.Ct. at 3148, *citing Sinclair Refining Co. v. Atkinson*, 370 U.S. at 225, 82 S.Ct. 1328 (Brennan, J., dissenting). It is only when an injunction is required to vindicate the contractual arbitration process that the anti-injunction policy of the Norris-LaGuardia Act will be accommodated to satisfy the public policy favoring peaceful settlement of labor disputes through arbitration. *Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. at 253, 90 S.Ct. 1583. The key to issuance of a *Boys Markets* injunction is a finding that the issue underlying the work stoppage is arbitrable. In this case however, the District Court found that there was "no arbitrable grievance underlying the work stoppage", but rather the work stoppage resulted from the miners' reluctance to cross the stranger picketlines. Thus, as in *Buffalo Forge*, whether motivated by sympathy or fear of reprisal, the work stoppage was not caused by an arbitrable dispute between the mine workers and the employer. The strike had "neither the purpose or the effect of denying or evading an obligation to arbitrate or of depriving the employer of his bargain." *Buffalo Forge Co. v. United Steelworkers of America*, 428 U.S. at 408, 96 S.Ct. at 3147. *Accord, U.S. Steel Corp. v. United Mine Workers*, 418 F.Supp. 172, 174–75 (W.D.Pa.1976) *aff'd* 548 F.2d 67 (3d Cir. Dec. 20, 1976). *See also Plain Dealer Publishing Co. v. Cleveland Typo. Union # 53*, 520 F.2d 1220 (6th Cir. 1975).[8] The legality of the primary picketing is irrelevant. *See Island Creek Coal Co. v. United Mine Workers*, 507 F.2d 650, 652 n.3 (3d Cir. 1975). *Buffalo Forge* also requires us to reject the Company's contention that the arbitration clause in the collective bargaining agreement is broad enough to encompass the issue of whether the union had contracted away the employees' right to honor picketlines. The Bituminous Coal Wage Agreement of 1974 contains a broad arbitration provision which provides for arbitration of differences over the meaning and application of the contract and any "local trouble." Although the broad arbitration clause could, on its face, include the refusal to cross a picketline, the absence of an express no-strike clause in the contract is fatal to the Company's claim of arbitrability. In *Kellogg Co. v. NLRB*, 457 F.2d 519, 525 (6th

---

*the Refusal to Cross Another Union's Picket Line*, 26 Case W.Res.L.Rev. 178, 194 n. 87 (1975) (hereinafter Abrams).

**8.** As the Court observed in the *Plain Dealer* opinion;

[T]here is a clear difference between a labor dispute which results from a work stoppage and a work stoppage which is the result of a labor dispute arising from conditions of employment. . . . The latter is enjoinable . . . [not] the former. . . . 520 F.2d at 1227.

Cir. 1972), we stated that the employees' right to honor another's picketline may only be waived through "clear and unmistakable language." Justice Black in *NLRB v. Rockaway News Co*, 345 U.S. 71, 81, 73 S.Ct. 519, 525, 97 L.Ed. 832 (1953) (Black, J., dissenting), offered one explanation why waiver of the right to honor picketlines may not lightly be read into collective bargaining agreements:

One way some union men help others is to refrain from crossing picket lines. Habitual respect for union picket lines has long been the practice of union men. This practice has been a prized asset of the unions. The Taft-Hartley Act was designed to regulate and restrict the type of concerted activities in which employees could engage. But even that Act did not attempt to deprive unions of the advantage of a policy that required union men to respect picket lines.

The present Court apparently shares Justice Black's view since both the majority and dissenting justices in *Buffalo Forge* agreed that an implied no-strike agreement does not extend to sympathy strikes. The majority opinion remarked, "[t]o the extent that . . . courts . . . have assumed that a mandatory arbitration clause implies a commitment not to engage in sympathy strikes, they are wrong." 428 U.S. at 408 n. 10, 96 S.Ct. at 3147. *Accord, id.* at 425 n. 17, 96 S.Ct. at 3155 (dissenting opinion). The Bituminous Coal Wage

Agreement of 1974 does not contain an express no-strike clause so the issue of the union's right to refuse to cross a picketline is not even arguably arbitrable. Since the unions' refusal to cross the stranger picketlines did not involve an arbitrable dispute between the employer and its employees, it is non-enjoinable, *see Buffalo Forge Co. v. Retail Clerks Union,* 428 U.S. at 426 n. 20, 96 S.Ct. 3141 (dissent), and therefore cannot provide a basis for contempt citations. *See United States Steel Corp. v. United Mine Workers of America,* 519 F.2d 1236, 1249 (5th Cir. 1976).[9] We are not insensitive to the plight of the Company whose mines are shut down by reason of a labor dispute to which it isn't a party. However, unlike the employer in *Buffalo Forge,* the Company here does have recourse in the courts to reopen the mines. If the stranger pickets are there illegally, as it seems they are, the employer may resort to various legal remedies directed at the illegal pickets.[10] After the stranger pickets are dispersed, the membership of the local unions will be free to return to work. We realize that this raises some practical difficulties for the employer, but the alternative is to hold the union to a bargain it never made and impermissibly interject the federal courts into the collective bargaining process.

We now turn to the final issues on appeal, the unions' contention that the preliminary injunctions are overbroad and vague.[11] Specifically, the unions charge

---

9. One case supporting the Company's position is *Armco Steel Corp. v. United Mine Workers of America,* 505 F.2d 1129 (4th Cir. 1974). In that case, the Fourth Circuit found that the district court had the power to enjoin the miners' refusal to cross stranger picketlines established by unidentified pickets. However, in *Buffalo Forge, Armco* was listed among the decisions which the Court said were at odds with the opinion which it affirmed. 428 U.S. at 404 n. 9, 96 S.Ct. 3141. The Court also expressly overruled the assumption made in *Armco* that a mandatory arbitration clause implies a duty not to engage in sympathy strikes. *Id,* at 408 n. 10, 96 S.Ct. 3141.

10. If the stranger pickets are engaged in a secondary boycott, the employer may pursue remedies before the National Labor Relations Board alleging violation of § 8(b)(4) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4) (1970). The Board is required to give expedited treatment to a secondary boycott charge and, if there is "reasonable cause to believe such charge is true," the Board must go to court and seek an injunction under § 10(*l*) of the Act. 29 U.S.C. § 160(*l*) (1970). If violence is threatened, § 7 of the Norris-LaGuardia Act permits injunctive relief to clean up the line. *See generally Abrams, supra,* at 195 n. 92, 197 n. 104, 210 n. 158.

11. Overbreadth and vagueness are distinct concepts:

Analytically, the broadness of an injunction refers to the range of proscribed activity, while vagueness refers [to] the particularity with which the proscribed activity is described. Developments in the Law—Injunctions,

that the injunctions amount to an outright ban on all work-stoppages during the life of the contract, without regard to the arbitrability of the underlying disputes. This, they claim, exceeds the "narrow exception" to the Norris-LaGuardia Act recognized in *Boys Markets* and violates § 9 of the Act which limits the scope of injunctions issued in cases involving labor disputes.[12] Finally, the unions submit that the decrees are impermissibly vague because they fail to conform to the requirement of Rule 65(d) that injunctions "be specific in terms" and "describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained." Fed.R.Civ.P. 65(d). The Company denies that the Court's orders are vague and argues that an injunction need not be restricted to past acts specifically pleaded and proved where a union has shown a proclivity to strike over arbitrable grievances and the court has found that similar strikes are likely to recur. Thus, we are presented with the fundamental question of whether an injunction restraining a work stoppage may ever by prospective in effect and, if so, under what circumstances.

A number of circuit courts have addressed the question but have failed to reach a consensus. In *Old Ben Coal Corp. v. Local No. 1487, UMW*, 500 F.2d 950 (7th Cir. 1974), the Seventh Circuit upheld an injunction that permanently enjoined the union from striking over differences it was bound to arbitrate under the National Bituminous Coal Wage Agreement of 1971. The final decree incorporated the language of the arbitration clause. The district court

had found that the union followed a policy of ignoring the contractual grievance and arbitration machinery in favor of wildcat strikes over arbitrable disputes. In upholding the injunction, the Seventh Circuit mentioned that a broad restraint on future strikes was the only adequate remedy to relieve the employer from irreparable injury caused by the numerous work stoppages. *Id.* at 953. The Seventh Circuit interpreted *Boys Markets* as permitting injunctions as broad as necessary to protect the arbitration process and declared that "the breadth of an injunction is to be determined by the extent of the misconduct." *Id.* The *Old Ben* Court also held that incorporation of the contractual language cured the decree of vagueness. *Id.* In *C F & I Steel Corp. v. United Mine Workers of America*, 507 F.2d 170 (10th Cir. 1974), the Tenth Circuit followed *Old Ben* and affirmed the grant of prospective injunctive relief. Unlike the *Old Ben* injunction, the order in *C F & I* was limited to specific areas of dispute which had led to work stoppages in the past. Finding nothing in *Boys Markets* inconsistent with equitable relief directed at future conduct and relying on the standards for judging the permissible breadth of injunctions announced in *NLRB v. Express Publishing Co.*, 312 U.S. 426, 436–37, 61 S.Ct. 693, 85 L.Ed. 930 (1941), and applied in *NLRB v. Local 282, Teamsters*, 428 F.2d 994, 999 (2d Cir. 1970), the Tenth Circuit ruled that a prospective injunction may issue where a union has shown a proclivity to strike over arbitrable disputes.[13] *Id.* at 174–77. The Court dismissed the union's argument that the injunction violated § 9 of the Norris-LaGuardia Act because the

---

78 Harv.L.Rev. 994, 1064 (1965). "Vagueness" is a question of notice, i.e., procedural due process, and "broadness" is a matter of substantive law. *See* Wright & Miller, Federal Practice & Procedure 2953 at 546–47 (1973).

*United States Steel Corp. v. United Mine Workers of America*, 519 F.2d 1236, 1246 n. 19 (5th Cir. 1975).

12.  [E]very restraining order or injunction granted in a case involving or growing out of a labor dispute shall include only a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint

or petition filed in such case and as shall be expressly included in said findings of fact made and filed by the court as provided in this chapter.

29 U.S.C. § 109 (1970).

13.  The *CF&I* Court has been criticized for applying standards developed in public law cases to a § 301 action, which is essentially a private contracts suit. *See United States Steel Corp. v. United Mine Workers of America*, 519 F.2d 1236, 1247 n. 21 (5th Cir. 1975); *United States Steel Corp. v. United Mine Workers of America*, 534 F.2d 1063, 1076 (3d Cir. 1976).

union had adequate notice that the Company was seeking injunctive relief against future violations of the implied no-strike agreement. *Id.* at 176. In *Donovan Construction Co. v. Construction & Maintenance Laborers Union, Local 383*, 533 F.2d 481, 484–86 (9th Cir. 1976), the Ninth Circuit announced its willingness to join the Seventh and Tenth Circuits in ordering prospective injunctive relief whenever a party "can adduce convincing evidence that the anticipated labor dispute is sufficiently likely to occur, and that the harm threatened thereby is of such magnitude as to bring his situation within the *Boys Markets* guidelines."[14] *Id.* at 484.

In *United States Steel Corp. v. United Mineworkers of America*, 519 F.2d 1236 (5th Cir. 1975), the Fifth Circuit took the opposite position and indicated that prospective injunctive relief may never be granted in a § 301 action. Judge Wisdom, writing for the Court, held that the broad prospective injunction issued by the district court exceeded the limits of *Boys Markets* and thus violated the Norris-LaGuardia Act. *Id.* at 1245. Repeating the warning from *Boys Markets* that not every strike over an arbitrable dispute is enjoinable, Judge Wisdom expressed the belief that the guidelines set down in *Boys Markets* require case-by-case adjudication whenever an injunction is sought against a particular work stoppage. *Id.* He characterized the prospective injunction issued by the district court as "the very evil Norris-LaGuardia sought to remedy," and observed that the decree embodied the presumption that every strike during the life of the contract would violate the court's order and force the union to litigate

the applicability of *Boys Markets* in contempt proceedings. *Id.* He also concluded that the injunction violated § 9 of the Norris-LaGuardia Act because the decree was not limited to specific acts referred to in the complaint. *Id.* at 1249. The lack of specificity in the terms of the injunction, according to Judge Wisdom, also rendered the injunction impermissibly vague in violation of Rule 65(d) despite the incorporation of language from the collective bargaining agreement in the order. *Id.* Thus, in the Fifth Circuit it appears that a prospective injunction may never issue in a case arising out of a labor dispute and an employer faced with a series of wildcat strikes must adjudicate each work stoppage on a case-by-case basis.

The Third Circuit became the most recent entry in the field with its decision in *United States Steel Corp. v. United Mine Workers of America*, 534 F.2d 1063 (3d Cir. 1976). Precisely defining the position of the Third Circuit is complicated by the fact that each member of the panel filed a separate opinion. Judge Gibbons wrote the main opinion in which Judge Rosenn concurred with Chief Judge Seitz concurring in the result. Although the Court of Appeals reversed the trial court and vacated the injunction as vague and overbroad, Judge Gibbons, with Judge Rosenn concurring, stated that federal courts in § 301 actions had the power to enjoin prospectively "a pattern of contract violations." *Id.* at 1078. In reaching this conclusion, Judge Gibbons reviewed the precedents in other circuits and discussed at length Judge Wisdom's belief that *Boys Markets* required case-by-case adjudication and thus barred prospective relief:

**14.** The Ninth Circuit vacated the injunction in *Donovan* as overbroad because of the insufficiency of factual support in the record for a prospective decree:

We read this to mean that each restraint imposed by a *Boys Markets* injunction must be grounded on a finding by the District Court that the activity restrained is a proper subject for injunctive relief despite the Norris-LaGuardia Act. If the scope of the injunction is so broad as to enjoin union activity in situations that the court *could not have found* to be suitable for *Boys Markets* relief,

because of the paucity of factual support for the necessary findings, the injunction crosses the jurisdiction boundary of the Norris-LaGuardia Act. We believe the injunction here crossed that boundary.

The record before us provides no evidence other than a single work stoppage that future strikes were likely, that they would cause irreparable harm, that there was no adequate remedy at law, or that the employer would suffer more from the denial of the injunction than would the union from its issuance. 533 F.2d at 486 (emphasis in the original).

The power of a federal court to decide the meaning of a labor agreement in a § 301 suit is clear. Once it has been done so it should not be required to relitigate essentially the same issue in a slightly different context over and over again. If the plaintiff in a § 301 suit pleads and proves that the defendant, whether labor organization or employer is engaging in a pattern of conduct which results in repeated and similar violations, nothing in § 9 of the Norris-LaGuardia Act, as we read it, prevents an injunction directed at such a course of conduct. The court that has once determined in an adversary proceeding the meaning of a contract must have the power to protect the parties and itself from the necessity for and burden of repeatedly adjudicating what often may be the identical issue. And while we agree with Judge Wisdom that the *Lincoln Mills-Boys Markets* exception to the Norris-LaGuardia Act requires ad hoc adjudication relating the violation to the contract, we do not agree that a remedial injunction may not encompass a pattern of ongoing activity. It is by no means clear that Judge Wisdom intended to suggest that injunctive relief is entirely unavailable against a chronic pattern of continuing mischief. If he did, however, we respectfully disagree.

*Id.* at 1077. He also commented on the factual findings a district court should make in determining the breadth of a prospective injunction:

Prospective injunctive relief should go as far as, but no farther than, the pattern of violations suggests is necessary. Before prospective injunctive relief is ordered the district court must, we think, make specific findings based on evidence in the record as to the types of violations which have occurred in the past and limit injunctive relief to the likelihood of their recurrence, or to new and different kinds of violations which may be expected to occur in the future. *Id.*

Judges Gibbons and Rosenn parted ways, however, on the issue of whether an injunction may ever be phrased as broadly as the arbitration clause of the collective bargaining agreement. Judge Gibbons expressed the fear that an overbroad injunction would unfairly tip the economic balance in favor of the employer:

A blanket injunction in the language of the arbitration clause places in the hands of the successful § 301 plaintiff a weapon by which harassment by contempt citations may take the place of the normal ongoing collective bargaining process. No § 301 defendant should be subjected to that risk.

*Id.* at 1078 (footnote omitted). Judge Rosenn, on the other hand, would permit an injunction as broad as the arbitration clause whenever strikes in violation of the no-strike agreement are so widespread as to defy categorization. *Id.* at 1082–83. In summary, the circuit precedents on the permissible breadth of injunctive relief in § 301 actions are far from uniform. The Tenth, Ninth and Third Circuits would appear to sanction prospective injunctive relief against specifically identified contractual violations which have occurred in the past and are likely to recur in the future. The Seventh Circuit would permit an injunction as broad as the contractual arbitration clause, and the Fifth Circuit would seem to bar any injunctive relief against future strikes.

We prefer to take an intermediate position. We see nothing in *Boys Markets* that is inconsistent with a grant of prospective injunctive relief in the exercise of § 301 jurisdiction. Justice Brennan, the author of the *Boys Markets* decision, clearly envisioned the possibility of prospective relief in his *Sinclair* dissent:

The complaint alleged that the union had, over the past several months, repeatedly engaged in "quickie" strikes over arbitrable grievances. Under the contract and the complaint, then, the District Court might conclude that there have occurred and will continue to occur breaches of contract of a type to which the principle of accommodation applies. It follows that rather than dismissing the complaint's request for an injunction, the Court should remand the case to the Dis-

trict Court with directions to consider whether to grant the relief sought—an injunction against future repetitions. This would entail a weighing of the employer's need for such an injunction against the harm that might be inflicted upon legitimate employee activity. It would call into question the feasibility of setting up *in futuro* contempt sanctions against the union (for striking) and against the employer (for refusing to arbitrate) in regard to prospective disputes which might fall more or less clearly into the adjudicated category of arbitrable grievances. In short, the District Court will have to consider with great care whether it is possible to draft a decree which would deal equitably with all the interests at stake.

*Sinclair Refining Co. v. Atkinson*, 370 U.S. at 228–29, 82 S.Ct. at 1346.

It cannot seriously be disputed that a series of wildcat strikes in derogation of a mandatory arbitration clause can severely cripple a mine's production rate causing the mine owner irreparable injury and leave the contractual arbitration machinery in shambles. In *Boys Markets* the Supreme Court described a union's no-strike obligation, express or implied, as the *quid pro quo* for the employer's undertaking to submit disputes to the arbitration process. 398 U.S. at 248, 90 S.Ct. 583. Wide-scale disregard of the union's no-strike obligation deprives the employer of the benefit of the bargain struck during the negotiations and threatens the underpinnings of the arbitration process. For this reason, federal courts are empowered by § 301(a) to specifically enforce arbitration agreements where one party is attempting to evade its contractual responsibility. As the *Boys Markets* majority observed:

. . . the fact remains that the effectiveness of such agreements would be greatly reduced if injunctive relief were withheld. Indeed, the very purpose of arbitration procedures is to provide a mechanism for the expeditious settlement of industrial disputes without resort to strikes, lockouts, or other self-help meas-

ures. This basic purpose is obviously largely undercut if there is no immediate, effective remedy for those very tactics that arbitration is designed to obviate. *Id.* at 249, 90 S.Ct. at 1591. An employer faced with the tactic of repeated strikes over arbitrable grievances need not repair to federal court each time his plant is shut down to relitigate issues decided in previous litigation. *See United States Steel Corp. v. United Mine Workers of America*, 534 F.2d at 1077. Once a court has found that a union is engaged in a continuing practice of striking over arbitrable disputes and the *Boys Markets* guidelines are satisfied, we believe that the ensuing injunction may be extended to encompass future strikes over disputes similar to those which caused strikes in the past. To unduly restrict the scope of injunctive relief deprives the employer of an "immediate, effective remedy" and defeats the national policy of fostering arbitration. We join those courts which have concluded that granting prospective injunctive relief in appropriate cases is consistent with the accommodation reached in *Boys Markets* between the policies of the Norris-LaGuardia Act and the public policy encouraging peaceful settlement of labor disputes through arbitration.

Our holding that prospective injunctive relief may be appropriate in § 301 actions should not be construed to reflect an insensitivity to the dangers posed by overbroad injunctions. We share Judge Wisdom's concern that the indiscriminate issuance of blanket injunctions by over-zealous courts could signal a return to the pre-Norris-LaGuardia era of ad hoc sweeping anti-strike decrees. Even though we believe that § 9 of the Norris-LaGuardia Act must be accommodated where necessary to conform to national labor policy, § 9 still requires a court to issue the narrowest possible injunction necessary to effectively safeguard the plaintiff's rights. *Cf. International Assoc. of Machinists v. Street*, 367 U.S. 740, 773, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961). We need not decide here whether a court should ever issue an injunction as broad as the contractual arbitration

clause.[15] We note however, that a court called on to supervise a blanket injunction runs a grave risk of becoming ensnarled in the private relationship of the parties and substituting its interpretation of the collective bargaining agreement for that of the arbitrator. An overbroad injunction presents the same risk of excessive judicial entanglement that led the Supreme Court in *Buffalo Forge* to reject the argument that the arbitrability of the scope of the no-strike clause was itself sufficient basis for a *Boys Market* injunction. The practical effect of an overbroad prospective injunction is to permit specific enforcement of the union's no-strike obligation through the contempt power, a result that *Buffalo Forge* may not countenance. Courts should be wary of introducing new weapons into the economic struggle between labor and management.[16] *See Pittsburgh Plate Glass Co. v. NLRB*, 427 F.2d 936, 946 (6th Cir. 1970) *aff'd* 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). An overbroad injunction inhibits the exercise of important employee rights and induces the employer to resort to the courts for contempt proceedings rather than to submit disputes to arbitration. Thus, an overbroad injunction sacrifices the national policy of avoiding interference in the private economic affairs of the parties without furthering the cause of arbitration. Therefore, prospective injunctions should only be granted in extreme cases where absolutely necessary to preserve the arbitration process agreed to by the parties. The decree must be narrowly drawn and firmly grounded on factual support in the record. Before an injunction may issue which grants prospective relief, the District Court should expressly find: that the present strike may be enjoined under *Boys Markets*;[17] that the union has

engaged in a pattern of strikes over arbitrable grievances that is likely to continue; that the strikes constituting the pattern of violation would warrant relief under the *Boys Markets* formula; and, that the decree is limited to specifically identified areas of dispute which have already been adjudicated and which satisfy the *Boys Markets* guidelines.

Applying these standards, we are constrained to agree with the local unions that the preliminary injunctions issued in this case are overbroad and must be vacated. The injunctions amount to nothing less than a court order that the employees report to work daily during the pendency of the action. We also conclude that the factual findings made by the District Court cannot support the breadth of the injunction. To sustain a prospective injunction, a court must make detailed findings concerning the pattern of past work stoppages and the likelihood of their recurrence and relate those findings to the *Boys Markets* formula. Taking judicial notice that strikes have occurred in the past over arbitrable grievances is not sufficient. *See United States Steel v. United Mine Workers of America*, 534 F.2d at 1077; *Donovan Construction Co. v. Construction, Production & Maintenance Laborers Union, Local 383*, 533 F.2d at 486. To the extent that prior work stoppages were occasioned by the miners' refusal to cross picketlines set up at the mines, *Buffalo Forge* prevents their inclusion in the District Court's finding of an ongoing pattern of strikes subject to *Boys Markets* injunctions. We also conclude that the injunctions were impermissibly vague in violation of Rule 65(d), and that this vagueness was not cured by reference to the contractual arbitration provision.[18] The orders re-

---

**15.** *But see United States Steel Corp. v. United Mine Workers of America*, 534 F.2d at 1081 n. 7, 1082–83 (Rosenn, J.).

**16.** An injunction restraining a work stoppage may often settle the underlying labor dispute prematurely and permanently. *See Buffalo Forge Co. v. Retail Clerks Union*, 428 U.S. at 412, 96 S.Ct. 3141. For this reason, the injunctive remedy should be used sparingly. *See generally* Abrams, *supra* at 200, 205–06.

**17.** *But see CF&I Steel Corp. v. United Mine Workers of America*, 507 F.2d at 176.

**18.** However, we find that the unions did receive ample notice from the amended complaint of the Company's intention to seek prospective relief and reject the contention to the contrary. See *CF&I Coal Co. v. United Mine Workers of America*, 507 F.2d at 176.

strained the local unions from "any further work stoppages" and thus, by implication, included work stoppages that the court would have no power to enjoin. Even if the decrees were limited to work stoppages over issues subject to the arbitration clause, the unions could only gauge their conduct by reference to the Bituminous Coal Wage Agreement of 1974, and then be forced to test their interpretation of that agreement through contempt proceedings. Rule 65 requires that injunctions be specific "so that those who must obey them will know what the court intends to require and what it intends to forbid." *Longshoremen v. Marine Trade Assoc.*, 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1968). The orders issued in this case do not inform the parties exactly what it is that the Court expects of them. A better course would have been to include instructions informing the parties of specific steps they must take to prevent a recurrence of the illegal work stoppages.[19] *See United States Steel Corp. v. United Mine Workers of America*, 534 F.2d at 1078. Finally, a decree granting prospective relief must include an order to the employer directing him to arbitrate all grievances within the scope of the injunction. *See Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. at 254, 90 S.Ct. 1583. The parties have raised a number of other issues which we have considered and find to be without merit. For the reasons stated above, we vacate the injunctions granted by the District Court and remand for proceedings not inconsistent with this opinion.

---

**19.** The District Court should also consider whether there are any viable alternatives to issuance of a prospective injunction. For instance, even where injunctive relief is not available, courts may order arbitration of the underlying issues if the contract so provides. *See Buffalo Forge Co. v. United Steelworkers of America, AFL–CIO,* 428 U.S. at 405, 96 S.Ct. 3141. The Court, within the exercise of its equitable power, may also require expedition of the arbitration process where necessary to prevent "foot-dragging" in the submission of disputes to arbitration. *See generally* Abrams, *supra* at 186 n. 39, 197 n. 45, 211 n. 163.