**Bobbie A. RUCKER, Plaintiff,**

v.

**CITY OF KETTERING, OHIO, et al., Defendants.**

No. C–3–99–429.

United States District Court, S.D. Ohio, Western Division.

Feb. 7, 2000.

Isabel Suarez, Dayton, OH, Mark Allan Anthony, Dulaney & Phillips, Dayton, OH, for Bobbie A. Rucker, plaintiff.

David L. Eubank, City of Kettering, Kettering, OH, Robert Forrest Cowdrey, Jenks, Surdyk & Cowdry Co., Dayton, OH, for Kettering City, defendant.

Michael William Krumholtz, Joseph C. Oehlers, Bieser, Greer & Landis, Dayton, OH, for James O'Dell, Chief of Police, defendant.

Louise S. Brock, Dinsmore & Shohl, Cincinnati, OH, Gary Edward Becker, Dinsmore & Shohl, Cincinnati, OH, for Richard Strader, defendant.

DECISION AND ENTRY OVERRULING MOTION FOR PRELIMINARY INJUNCTION (DOC. # 2), FILED BY PLAINTIFF BOBBIE A. RUCKER

RICE, Chief Judge.

This lawsuit stems from the Plaintiff's unsuccessful attempt to apply for employment as a civilian jailer. In response to an advertised job opening, the Plaintiff sought an application for the jailer position from Defendant City of Kettering, Ohio. City employees refused to provide the Plaintiff with an application, however, because she was a female. As a result, the Plaintiff commenced the present litigation, asserting causes of action under 42 U.S.C. § 1983 and Ohio Revised Code § 4112.02, and seeking injunctive relief and compensatory damages. (Amended Complaint, Doc. # 17). Her amended Complaint names several Defendants, including the City of Kettering, Chief of Police James O'Dell, Human Resources Director Richard Strader, and Human Resources Analyst Karen Sejas, all of whom are City employees who have been sued in their official capacities.[1] (*Id.*). Along with her amended Complaint, the Plaintiff also has filed a Motion for a Temporary Restraining Order ("TRO"), and Preliminary and Permanent Injunction. (Doc. # 2).

Following a telephone conference call, the Court entered a September 8, 1998, TRO, enjoining the City from accepting additional applications for the position of civilian jailer. (Doc. # 5). The Court also enjoined the City from filling a vacant jailer position[2] or conducting a written examination for the job. (*Id.*). Thereafter, on September 21, 1999, the Court held an oral and evidentiary hearing on the Plaintiff's Motion for a Preliminary Injunction. The parties subsequently filed post-hearing briefs, further addressing the legality of the City's failure to provide the Plaintiff with an employment application. After reviewing those filings and the evidence introduced at the hearing on the Plaintiff's Motion, the Court concludes that she has not demonstrated her entitlement to a preliminary injunction. Accordingly, for the reasons set forth more fully below, the Plaintiff's Motion for a Preliminary Injunction (Doc. # 2) will be overruled.

## I. *Findings of Fact*[3]

Plaintiff Bobbie A. Rucker is a thirty-seven year old female. She began her career as a correctional officer at the Hocking Correctional Institution in Nelsonville, Ohio, where she worked from March, 1986, until January, 1987. At Hocking, Rucker worked on shifts with male and female correctional officers who guarded the all-male inmate population. Among other things, her responsibilities included conducting "pat-downs" and watching as inmates stood behind curtains and "dressed out" into prison jump suits.[4] From the Hocking facility, Rucker went to work as a correctional officer at the Dayton Correctional Institution in Dayton, Ohio, where she performed similar tasks. While working at the Dayton facility,

---

1. In her original September 2, 1999, Complaint (Doc. # 1), Rucker had named Kettering City Manager Steven Husemann as a Defendant, along with several Jane/John Doe Defendants. Thereafter, Husemann was dismissed as a party to this litigation (Doc. # 15), and he is not named as a Defendant in the Plaintiff's amended Complaint. Likewise, the amended Complaint does not include any Jane/John Doe Defendants.

   Substantively, however, the Plaintiff's amended Complaint (Doc. # 17) is identical to her original Complaint. (Doc. # 1). Consequently, for purposes of its analysis herein, the Court will refer to the allegations contained in the amended Complaint.

2. Although the Court prohibited the City from filling the civilian jailer vacancy, it did allow the acquisition of civilian jailer services "on an emergency and temporary basis." (Doc. # 5).

3. The Court's factual findings are based upon testimony presented during the September 21, 1999, oral and evidentiary hearing on the Plaintiff's Motion for a Preliminary Injunction. The pertinent facts are essentially undisputed by the parties.

4. "Dressing out" involves changing from street clothes into prison-issued clothing.

Rucker also worked with male and female correctional officers guarding an all-male inmate population. Ultimately, she rose to the rank of captain and had approximately 115 correctional officers under her supervision. She quit her job in September, 1996, however, and began driving trucks commercially.

Thereafter, in August, 1999, Rucker saw a newspaper advertisement for a civilian jailer position with the City of Kettering, Ohio. After reviewing the advertisement, she went to the City's government center and expressed her interest in applying for the job. In response, Kettering Human Resources Analyst Karen Sejas refused to accept Rucker's application. Sejas informed Rucker that the City hires only males to work as civilian jailers. Sejas also explained to Rucker that the Ohio Civil Rights Commission had approved the City's decision to hire only male jailers.

The City's refusal to hire female jailers stems from the fact that its jail is a five-day holding facility, which houses only male inmates who have not been convicted of a crime. The jail has a maximum capacity of seven inmates, and ninety percent of its occupants have been arrested for misdemeanor offenses. Arrested females are not integrated into the Kettering facility. Rather, they are taken to the facility only briefly and given an opportunity to post bond. If they cannot do so, they are transported immediately to the Montgomery County jail, which houses male and female inmates.

Five full-time civilian jailers staff the Kettering facility in eight-hour shifts, seven days a week, twenty-four hours a day. Thus, the seven-day work week includes three eight-hour shifts per day, for a total of twenty-one shifts each week. Of those twenty-one shifts, seventeen are covered by one jailer, and four are covered by two jailers working together. Consequently, all of the City's civilian jailers spend at least part of their work week alone supervising the inmates. Shift assignments are made on the basis of seniority, and the jailers do not operate under a union contract.

The job responsibilities of the civilian jailers are varied. Among other things, they perform occasional pat-down searches. At the Kettering facility, such searches require the jailers to pat the clothing covering the male inmates' genitals. Performing strip searches is also considered a job responsibility of the City's jailers. In practice, however, strip searches at the Kettering facility are extremely rare, and they require written pre-approval from a supervisor.[5] The jailers also provide inmates with various shower supplies each morning, including towels, shavers, soap, shaving cream, and razors. After showering, the inmates return their supplies and walk, often naked, through the jail's day room. In addition, the jailers are responsible for observing new inmates as they strip to their underwear and replace their personal clothing with City-issued pants, shirts, and shoes. Pursuant to jail policy, the civilian jailers are also responsible for directly observing each inmate every thirty minutes. Such observation is conducted by viewing video monitors and by physically checking on the inmates in their cells. Finally, the jailers' job responsibilities include cleaning all toilets, urinals, laboratories, drinking facilities, and bathing facilities on a daily basis.

Although the City insists that allowing female jailers to perform many of the foregoing tasks would be "inconvenient," jail supervisor Craig Bailey conceded during the September 21, 1999, oral and evidentiary hearing that a female jailer could perform the required pat-down searches. He also acknowledged that female jailers could dispense shower supplies, particularly if jail inmates were supplied with robes to wear to and from the shower. Additionally, Bailey recognized the possibility that male inmates could remain in their street clothes until a male jailer arrived on duty

---

**5.** During the September 21, 1999, oral and evidentiary hearing, jail supervisor Craig Bai- ley recalled only one strip search at the Kettering facility in the last four years.

to observe the "dress down" procedure. Likewise, he acknowledged that any required strip searches could be postponed until after a male jailer arrived on duty.

## II. *Analysis*

A District Court considers four factors when deciding whether to grant a preliminary injunction. Those factors are: (1) the likelihood that the party seeking relief will succeed on the merits of the claim; (2) whether the party seeking relief will suffer irreparable harm without the preliminary injunction; (3) the probability that granting the requested relief will cause substantial harm to others [6]; and (4) whether the public interest is advanced by the issuance of the preliminary injunction. *Cf. Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir.1994). These four considerations are factors to be balanced, rather than prerequisites that must be met. *Id.* With these standards in mind, the Court turns now to its analysis of Rucker's pending Motion.

## A. *Likelihood of Success on the Merits*

Rucker's amended Complaint asserts two causes of action against the City of Kettering and the individual Defendants, in their official capacities [7]: (1) a federal claim alleging a violation of 42 U.S.C. § 1983; and (2) a state law claim alleging a violation of Ohio Revised Code § 4112.02. Upon review, the Court concludes that Rucker has failed to demonstrate a likelihood of success on either claim.

### 1. *42 U.S.C. § 1983 (Count I)*

Section 1983 does not itself create any constitutional rights. Rather, it creates a federal cause of action for "the vindication of constitutional guarantees found elsewhere." *Braley v. City of Pontiac*, 906 F.2d 220, 223 (6th Cir.1990). Thus, in order to succeed on her § 1983 claim, Rucker must show, as a threshold matter: (1) that she was deprived of a right secured by the federal Constitution or laws of the United States; and (2) that she was subjected to this deprivation by a person acting under the color of state law. *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir.1994). Furthermore, because she has sued the City of Kettering, a municipality, Rucker must show that the City itself caused a constitutional deprivation. The City cannot be held responsible under a theory of *respondeat superior.* Rather, Rucker must show that the City, through a custom or policy, caused the alleged constitutional violation. *Monell v. New York Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The custom or policy must be the "moving force" behind the violation. *Id.* at 694, 98 S.Ct. 2018. "[T]o satisfy the *Monell* requirements[,] a plaintiff must 'identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy.'" *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir.1993), quoting *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir.1987).

In the present case, Rucker's amended Complaint alleges that the City has deprived her of rights secured by the Fifth,

6. Although the Sixth Circuit defines this branch of the four-part test in terms of harm to others, the focus is on the harm that a defendant will suffer if the requested injunctive relief is granted. It is with this factor that courts have traditionally balanced the equities (i.e., the harm that the plaintiff will suffer in the absence of an injunction is balanced against that which will befall the defendant if same is granted). *See Southern Ohio Coal Co. v. United Mine Workers of America*, 551 F.2d 695 (6th Cir.1977).

7. A suit against an individual in his "official capacity" is equivalent to a suit against the governmental entity for which he works. *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir.1994), citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 68, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Thus, Rucker's inclusion of City employees as Defendants adds nothing of substance to her Complaint. Therefore, in its analysis, *supra*, the Court will refer to the Defendants collectively as "the City."

Ninth, and Fourteenth Amendments. (Doc. # 17). In her Memorandum in support of a preliminary injunction and her post-hearing brief, however, Rucker fails to address any of these alleged constitutional violations specifically. Rather, she asserts generally that the City has violated § 1983 by discriminating against her because of her sex. (Doc. 7, 10). The City has construed Count I of Rucker's lawsuit as alleging a violation of her rights under the Equal Protection Clause of the Fourteenth Amendment. (Doc. # 11). After reviewing Rucker's filings, and the evidence presented at the September 21, 1999, oral and evidentiary hearing, the Court agrees with the City's interpretation of Rucker's amended Complaint. In essence, Rucker's argument is that the City denied her an employment opportunity on the basis of her gender. Therefore, she appears to assert a Fourteenth Amendment equal protection violation.

Insofar as Rucker's amended Complaint mentions the Fifth and Ninth Amendments, she has failed to make any substantive argument supporting a claim under either Amendment. In any event, the Court envisions no basis for Rucker to assert a § 1983 claim under the Fifth or Ninth Amendment. The Ninth Amendment provides that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." The Sixth Circuit has recognized that this Amendment "does not confer substantive rights in addition to those conferred by other portions of our governing law." *Gibson v. Matthews*, 926 F.2d 532, 537 (6th Cir.1991). Consequently, the Ninth Amendment "has never been recognized as independently securing any constitutional right, for purposes of pursuing a civil rights claim." *Strandberg v. City of Helena*, 791 F.2d 744, 748 (9th Cir.1986) (concluding that an alleged violation of the Ninth Amendment will not support a claim under 42 U.S.C. § 1983); *Basile v. Elizabethtown Area School Dist.*, 61 F.Supp.2d 392, 403 (1999) (recognizing that a § 1983 claim cannot be premised upon an alleged violation of the Ninth Amend-

ment). Likewise, Rucker's purported reliance upon the Fifth Amendment is unavailing. "[T]he right to equal protection of the laws expressed in the fourteenth amendment has been found by implication in the due process clause of the fifth amendment, *which applies to federal action.*" *Dunham v. Frank's Nursery & Crafts, Inc.*, 919 F.2d 1281 n. 4 (7th Cir. 1990) (emphasis added). In the present case, Rucker alleges that City employees acted under the color of state law. She does not allege any "federal action." Consequently, the Fifth Amendment is not implicated.

The critical inquiry, then, is whether the City's refusal to accept a civilian jailer application from Rucker violates the Equal Protection Clause of the Fourteenth Amendment. In *United States v. Virginia*, 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996), the Supreme Court recently reiterated the proper analysis when a plaintiff alleges a gender-based equal protection violation:

> Focusing on differential treatment or denial of opportunity for which relief is sought the reviewing court must determine whether the proffered justification is exceedingly persuasive. The burden of justification is demanding and it rests entirely on the State. The State must show at least that the [challenged] classification serves important governmental objectives and the discriminatory means employed are substantially related to the achievement of those objectives. The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation.

*Id.* at 532–533, 116 S.Ct. 2264 (internal quotation marks and citations omitted).

In their respective briefs, the parties fail even to mention the foregoing "intermediate scrutiny" standard, which has traditionally been applied to Fourteenth Amendment equal protection challenges based upon gender. Rather, Rucker and the City vigorously dispute whether being a male is a bona fide occupational qualifica-

tion ("BFOQ") for the position of Kettering civilian jailer—an issue which is critical in Title VII jurisprudence but not directly implicated by the Equal Protection Clause. In support of their respective positions, the parties rely entirely upon case law construing Title VII, which prohibits, among other things, sex discrimination. Title VII provides a narrow exception to its prohibition against sex discrimination, however, if an employer can show that being of a particular gender is a "bona fide occupational qualification" for the job at issue. In order to make such a showing, the employer must demonstrate that " 'the *essence* of the business operation would be undermined by not hiring members of one sex exclusively.' " *Harden v. Dayton Human Rehabilitation Center*, 520 F.Supp. 769, 776 (S.D.Ohio 1981) (Rice, J.), *aff'd* 779 F.2d 50 (6th Cir.1985), quoting *Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385, 388 (5th Cir.1971); *see also Reed v. County of Casey*, 184 F.3d 597, 599 (6th Cir.1999), quoting 42 U.S.C. § 2000e–2(e)(1) ("Thus, under the BFOQ defense, facial gender-based discrimination is permitted if gender 'is a bona fide occupational qualification reasonably necessary to the normal operation of [a] particular business or enterprise.' ").

In the present case, however, Rucker's amended Complaint does not allege a violation of Title VII. Rather, she alleges a violation of 42 U.S.C. § 1983, as a result of a deprivation of her equal protection rights under the Fourteenth Amendment. Unlike Title VII, the Equal Protection Clause does not include a BFOQ exception, per se. *Cf. Doyle v. Suffolk County*, 786 F.2d 523, 528 (2nd Cir.1986) (recognizing that equal protection claims do not require a BFOQ analysis); *Izquierdo Prieto v. Mercado Rosa*, 894 F.2d 467, 473 (1st Cir.1990). As

noted above, an equal protection analysis requires the Court to consider whether the exclusion of women from Kettering's civilian jailer positions serves any important governmental objectives and whether the discriminatory means employed are substantially related to the achievement of those objectives. Although the Fourteenth Amendment does not include a BFOQ exception, as such, the Court recognizes that a BFOQ analysis is not wholly incompatible with gender-based equal protection claims. In other words, if being male is reasonably necessary to the normal operation of Kettering's jail, for purposes of a BFOQ, then the City's gender-based hiring of civilian jailers would appear to serve an important governmental objective and to be substantially related to its achievement of that objective, for purposes of equal protection scrutiny. Indeed, the Sixth Circuit has recognized that "[a] plaintiff who alleges disparate treatment by a state employer is bringing essentially the same claim under Title VII as under § 1983. If there is liability under Title VII, there should be liability under § 1983. Similarly, if there is no discriminatory intent, there cannot be liability under either Title VII on a disparate treatment theory, or § 1983." *Grano v. Dept. of Development of the City of Columbus*, 637 F.2d 1073, 1082 (6th Cir.1980). Consequently, the Court finds the parties' Title VII BFOQ arguments to be pertinent, notwithstanding the fact that Rucker's amended Complaint alleges a violation of the Fourteenth Amendment and 42 U.S.C. § 1983. *Cf. Hardin v. Stynchcomb*, 691 F.2d 1364, 1369 n. 16 (11th Cir.1982) ("When section 1983 is used as a parallel remedy for violation of section 703 of Title VII the elements for the two causes of action are the same.").[8]

---

**8.** *See also Dothard v. Rawlinson*, 433 U.S. 321, 324 n. 20, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) ("In the case of a state employer, the bfoq exception would have to be interpreted at the very least to conform to the Equal Protection Clause of the Fourteenth Amendment." The parties do not suggest, however, that the Equal Protection Clause requires more rigorous scrutiny of a State's sexually

discriminatory employment policy than does Title VII. There is thus no occasion to give independent consideration to the District Court's ruling that Regulation 204 [which established gender-based criteria for the assignment of "correctional counselors to certain prison positions] violates the Fourteenth Amendment.").

In the instant case, the City argues that its refusal to accept an application from Rucker was justified under the so-called "BFOQ defense" set forth, *supra*. In support, it advances two arguments. *First,* the City insists that its "males-only" hiring policy constitutes a BFOQ for the job of civilian jailer because of general security concerns and issues related to inmate privacy. (Doc. # 11 at 18). *Second,* it contends that several provisions of the Ohio Administrative Code preclude the hiring of Rucker as a civilian jailer. The Court will address these arguments in turn.

a) *Security Concerns and Privacy Issues*

The City's specific security-related concerns involve female jailers: (1) performing strip searches and pat-downs; (2) observing the inmates changing into jail clothes; (3) conducting in-person surveillance; (4) performing periodic body counts; and (5) providing inmates with razors. (Doc. # 11 at 18). The City's privacy-related concerns involve female jailers: (1) observing the inmates changing into jail clothes; (2) monitoring the shower and toilet areas; and (3) conducting general "surveillance." (*Id.*).

Insofar as the City relies upon the foregoing "security" interests, it completely fails to explain how a female's performance of the aforementioned duties would raise security problems that would not exist if a male jailer performed those same responsibilities. From a strictly security-oriented perspective, the Court discerns no meaningful distinction between a female and male jailer performing strip searches and pat-downs, observing clothing changes, conducting in-person surveillance, performing body counts, and providing inmates with shaving razors. The City's Memorandum is devoid of any explanation why Rucker's performance of the such tasks would raise gender-related security

problems. An unsupported assertion of "security concerns" will not support the City's refusal to consider Rucker for the civilian jailer position. Based upon the evidence presented at the September 21, 1999, oral and evidentiary hearing, the City has not shown that jail security requires only males to be employed as civilian jailers.

■ Upon review, the Court finds the City's privacy concerns to be no more persuasive. It is well-settled that "a person's interest in not being viewed unclothed by members of the opposite sex survives incarceration." *Robino v. Iranon,* 145 F.3d 1109, 1111 (9th Cir.1998) (reasoning that gender was a BFOQ reasonably necessary to accommodate inmates' privacy interests and to reduce the risk of sexual conduct between guards and inmates); *see also Fortner v. Thomas,* 983 F.2d 1024, 1030 (11th Cir.1993); *Covino v. Patrissi,* 967 F.2d 73, 78 (2nd Cir.1992). In *Cornwell v. Dahlberg,* 963 F.2d 912, 916 (6th Cir.1992), the Sixth Circuit recognized that even a "convicted prisoner maintains some reasonable expectations of privacy while in prison, particularly where those claims are related to forced exposure to strangers of the opposite sex, even though those privacy rights may be less than those enjoyed by non-prisoners."

Consequently, the Court does not dispute that the individuals held at the Kettering facility retain some privacy rights. Approximately ninety percent of the City's inmates are held on misdemeanor charges, and they have not been convicted of a crime. It stands to reason that their privacy rights must equal, if not exceed, the privacy rights of prisoners who have been convicted of serious crimes.[9] On the other hand, it is equally apparent that women such as Rucker possess a right not to be discriminated against with respect to em-

---

**9.** *Cf. Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ("A fortiori, pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that ... are enjoyed by convicted prisoners."). *Id.* at 545, 99 S.Ct.

1861. It is beyond dispute, however, that the mere fact of incarceration, whether pre-trial or post-conviction, circumscribes the retained constitutional rights of an inmate. *Id.* at 545–546, 99 S.Ct. 1861.

ployment opportunities. *Harden,* 520 F.Supp. at 780.

When equal employment rights collide with inmates' privacy rights, resolution of the conflict requires an inquiry into whether the competing interests can be accommodated, or whether one interest must be vindicated to the detriment of the other.[10] In the prison and jail context, " '[t]he conflict between the right of one sex not to be discriminated against in job opportunities and the other to maintain some level of privacy has normally been resolved by attempting to accommodate both interests through adjustments in scheduling and job responsibilities for the guards.' " *Robino v. Iranon,* 145 F.3d 1109, 1110 (9th Cir.1998), quoting *Jordan v. Gardner,* 986 F.2d 1521, 1527 (9th Cir.1993) (en banc) (internal quotation and citation omitted). In *Harden,*

520 F.Supp. at 780, this Court recognized that the competing interests of inmate privacy and equal employment opportunity often can be reconciled by reassigning job responsibilities, rearranging shift schedules, or making physical alterations to the facility in question.[11] In the present case, however, the City appears to be incapable of altering job responsibilities or shift schedules to accommodate Rucker's employment. Given the jail's small staff size, Rucker would be required to work many shifts alone. Based upon the evidence presented at the September 21, 1999, hearing, however, the City has not demonstrated its inability to make minor work place adjustments which may be needed to accommodate Rucker's employment.

As a threshold matter, the Court notes that *few* such adjustments appear to be

10. *See, e.g., Reidt v. County of Trempealeau,* 975 F.2d 1336, 1339–1340 n. 3 (7th Cir.1992) (citations omitted) ("The BFOQ exception is recognized as very narrow, and only applies when the essence of the business operation would be undermined by not hiring members of one sex exclusively.... These cases recognize that Title VII's proscription against sexual discrimination in employment must be balanced against issues of inmate privacy and jail security in the context of the particular facts at hand. Stereotypical notions of a female's abilities, however, or unwarranted modesty, is not sufficient to justify a male-only position.... Administrative convenience also cannot justify limiting a position to one sex....").

11. In *Hardin,* this Court recognized that inmates' privacy interests might be protected by, inter alia, installing smoked glass, allowing inmates to cover their windows briefly, or making appropriate sleep wear available. *Harden,* 520 F.Supp. at 780. Other courts also have recognized that asserted privacy concerns will not justify withholding employment opportunities from members of one sex unless no other alternatives are available. For example, in *Torres v. Wisconsin Dept. of Health & Social Serv.,* 838 F.2d 944, 952–954 (7th Cir.1988) the Seventh Circuit reasoned:

The Second, Eighth and Eleventh Circuits, as well as several federal district courts, have considered attempts by states to restrict correctional officer and similar positions in prisons to the same sex as that of the inmates; in each of these cases, the court held that the privacy interests of the

inmates did not justify a sex bfoq for the position(s) involved.

. . .

A review of these analogous cases reveals that a prison can usually preserve the privacy interests of its inmates without sacrificing the right of correctional officers to equal employment opportunities; thus, a bfoq is rarely justified. The rationale for the claimed bfoq's that was most frequently offered in these cases was that the duties of the correctional officer positions at issue included performing strip searches and observing inmates while they were using the showers and toilets. These courts rejected this justification as inadequate and found that the prisons had not met their burden of proving that alternatives with less discriminatory impact were unavailable. For example, a prison could reassign duties involving strip searches and shower and toilet surveillance so that, other than in emergencies, these duties would be performed by officers of the same sex as the inmates.... In addition, a prison could install shower curtains that permit only enough visibility to allow the correctional officer to ascertain that the shower was occupied.... Absent countervailing security problems, a prison could afford inmates privacy when dressing or using a toilet in their cells by permitting them to cover the window on their cell doors while engaging in these activities.... Finally, a prison could provide inmates with suitable sleep wear to avoid inadvertent exposure of their bodies while sleeping....

*Id.* at 952–953 (citations omitted).

necessary. In its Memorandum, the City alleges, in conclusory fashion, that Rucker's employment would raise "privacy concerns" related to "frisk searches, in-person surveillance, official prisoner counts, toilet and shower facilities, and custodial duties associated with these facilities." (Doc. # 11 at 14). With respect to frisk-searches or "pat-downs" of male inmates, however, the City's fears are unfounded. The Sixth Circuit has recognized that "[a] pat-down search, which is by definition of short duration and minimal obtrusiveness, is not unconstitutional, even when performed by a female officer." *Brown v. Withrow*, 985 F.2d 559, 1993 WL 15141 (6th Cir. Jan.22, 1993), citing *Timm v. Gunter*, 917 F.2d 1093, 1100 (8th Cir.1990). Furthermore, its is unclear precisely how Rucker's general surveillance of inmates, her involvement in periodic prisoner counts, and her performance of janitorial responsibilities would raise substantial inmate privacy concerns. To the extent that such activities *may* implicate inmate privacy, however, such concerns likely would involve: (1) Rucker's observation of inmates who are asleep in various stages of undress; (2) her observation of inmates using shower facilities; and (3) her observation of inmates using the toilets in their cells. The City has failed to demonstrate, however, that it cannot economically minimize the foregoing concerns without refusing Rucker employment as a civilian jailer. For example, the City has failed to establish that it could not make available proper sleep wear to prevent the unwanted exposure of the inmates' bodies at night. The City also has failed to persuade the Court that it could not provide inmates with robes or towels to wear to and from the shower. Furthermore, the Court notes that observation of inmates in the showers *is not* a requirement of the civilian jailer position. At the September 21, 1999, oral and evidentiary hearing, jail supervisor

Bailey specifically testified that jailers are not required to watch inmates taking their showers. In addition, the Court is unaware of any jail regulation which prohibits the inmates from covering themselves while sitting on the toilet, and the inmates could have their backs turned to Rucker while standing. As a result, the male inmates could protect their own privacy, to a large extent, if they chose to do so.[12]

Finally, the possibility that a strip search may be required does not constitute a legitimate "privacy" concern justifying Rucker's exclusion from the civilian jailer applicant pool. Notably, such a possibility appears to be more theoretical than real. Although conducting strip searches is included in the civilian jailer job description, jail supervisor Craig Bailey recalled only *one* strip search at the Kettering facility in the last four years. Bailey also testified that jailers must obtain written pre-approval from a supervisor such as himself before conducting a strip search. Given the infrequency of strip searches at the facility, and the fact that jailers must obtain written approval beforehand, the City could have Bailey or another male supervisor come to the jail to observe an occasional strip search. The Court simply is unpersuaded that Rucker's inability to perform a strip search approximately once every four years is a reasonable basis for depriving her of an employment opportunity as a civilian jailer. In short, the City has failed to establish that its expressed "security" and "privacy" concerns justify its refusal to consider Rucker for employment.

b) *Requirements of the Ohio Administrative Code*

The City also argues that being a male is a BFOQ for the Kettering civilian jailer position, because certain provisions of the Ohio Administrative Code preclude the

---

**12.** Even if Rucker did occasionally observe the jail inmates without clothing, such observation would be unlikely to violate the inmates' constitutional rights. *See, e.g., Cookish v. Powell*, 945 F.2d 441, 447 (1st Cir.1991) (recognizing that "inadvertent, occasional, casual, and/or restricted observations of an inmate's naked body by a guard of the opposite sex did not violate the Fourth Amendment").

employment of a female in that position. As noted above, gender qualifies as a BFOQ when "the *essence* of the business operation would be undermined by not hiring members of one sex exclusively." *Harden*, 520 F.Supp. at 776. Stated differently, gender-based discrimination is permissible when being male or female " 'is a bona fide occupational qualification reasonably necessary to the normal operation of [a] particular business or enterprise.' " *Reed*, 184 F.3d at 599.

With the foregoing standards in mind, the Court finds the City's argument regarding the Ohio Administrative Code to be persuasive. The essential nature of the Kettering jail "is to lodge, keep, transport, feed and care for prisoners." *Reed*, 184 F.3d at 599. In so doing, the City must comply with state regulations established by the Ohio Department of Corrections. *Id.* At least three of those regulations may affect Rucker's ability to work as a civilian jailer for the City of Kettering. *First*, O.A.C. § 5120:1–10–01(L)(4) requires strip searches of male inmates to be conducted by male jailers.[13] *Second*, O.A.C. § 5120:1–10–03(V) obligates the City to implement written procedures minimizing the time that prisoners are left alone with staff members of the opposite sex.[14] *Third*, O.A.C. § 5120:1–10–01(L)(10) requires a male jailer to observe male inmates who are changing from street clothing into jail attire.[15]

Although the foregoing regulations do not expressly prohibit the City from hiring Rucker or any other females as civilian

jailers, the first and third regulations do impose specific gender-based job responsibilities upon the City's jailers. Those regulations provide that certain tasks must be performed by jailers who are of the same sex as the inmates. Furthermore, the second regulation requires the implementation of written procedures to "minimize" the time that prisoners are alone with opposite-sex staff members. As a means of analysis, the Court will review each of the foregoing regulations separately.

*First*, Ohio Admin.Code § 5120:1–10–01(L)(4) arguably impedes the City's ability to hire Rucker as a civilian jailer. It requires strip searches to "be conducted by a person or persons who are of the same sex as the person who is being searched." On its face, this regulation appears to prevent Rucker from working alone on a shift with the all-male inmates, because it precludes her from strip searching them. Based upon the testimony presented at the September 21, 1999, oral and evidentiary hearing, however, the Court concludes that the City easily could comply with § 5120:1–10–01(L)(4) and hire Rucker as a jailer. As noted, *supra*, jail supervisor Craig Bailey recalled only *one* strip search at the Kettering facility in the last four years. Furthermore, jailers must obtain written pre-approval from a supervisor before conducting a strip search. Consequently, the City could have Bailey or another male supervisor come to the jail to observe an occasional strip search. In light of the extremely rare occurrence of

13. O.A.C. § 5120:1–10–01(L)(4) provides:
   A strip search and/or body cavity search of [persons confined for the commission of a misdemeanor or traffic offense] shall be conducted by a person or persons who are of the same sex as the person who is being searched.
   Although § 5120:1–10–01(L)(4) mentions body cavity searches, those searches are not at issue in the present case, because they are conducted by physicians and nurses, not City jailers. *See* O.A.C. § 5120:1–10–01(L)(5).

14. O.A.C. § 5120:1–10–03(V) provides:
   Written procedures shall be implemented to minimize the time prisoners are left

alone with staff members of the opposite sex.

15. O.A.C. § 5120:1–10–01(L)(10) provides:
   Persons who are afforded a reasonable opportunity to secure release on bail or recognizance, but who fail to secure such release, and who are to be integrated with the general population of the detention facility shall be visually observed by a person of the same sex if changing into clothing that is required to be worn by inmates in the facility in accordance with paragraph (N) of this rule.

strip searches at the facility, and the requirement of written pre-approval, such a procedure is a reasonable alternative to denying Rucker employment.

*Second,* Ohio Admin.Code § 5120:1–10–03(V) also presents a potential obstacle to Rucker's employment as a civilian jailer. That regulation obligates the City to implement written procedures "to minimize the time prisoners are left alone with staff members of the opposite sex." Rucker interprets this regulation as requiring the City to minimize the time that prisoners are left alone one-on-one with staff members of the opposite sex. Conversely, the City interprets the regulation as requiring it to minimize the time that prisoners are left alone, both one-on-one *and* as a group, with staff members of the opposite sex. Although the Court has located no case law construing § 5120:1–10–03(V), it finds the City's interpretation to be the more reasonable one. The regulation directs the City to limit the time that prisoners are alone with staff members, not the time that *a* prisoner is alone with *a* staff member. Even if the City's (and the Court's) interpretation of the regulation is correct, however, § 5120:1–10–03(V) does not prevent it from hiring Rucker. Notably, the regulation does not prohibit guards from being alone with opposite-sex inmates. Rather, it directs the City to implement written procedures to "minimize" the time prisoners are left alone with staff members of the opposite sex. The word "minimize" means to reduce to the smallest possible extent. *See* Webster's Third International Dictionary at 1438. Thus, the City is merely required to have written procedures reducing, to the smallest possible extent, the time that female guards spend alone with male inmates at the Kettering facility. For example, the regulation might require the City to adopt a written procedure requiring male and female guards to work together on any two-per-

son shifts. When a female jailer works a shift by herself, however, she necessarily will spend that time alone with inmates of the opposite sex, and nothing in the regulation prohibits her from doing so.

*Third,* Ohio Admin.Code § 5120:1–10–01(L)(10) presents a potential impediment to Rucker's employment, because it requires jail inmates to "be visually observed by a person of the same sex if changing into clothing that is required to be worn by inmates in the facility. . . ." At the September 21, 1999, oral and evidentiary hearing, Rucker's counsel suggested that the City could comply with this regulation by having female jailers "visually observe" inmates through a semi-transparent partition or curtain. Admittedly, the City *could* implement such a procedure. The Court questions, however, whether such an accommodation for female jailers would violate the regulation. Although the Court has found no case law addressing § 5120:1–10–01(L)(10), the observation requirement is likely intended to minimize the opportunity for new inmates to bring into and secrete contraband and/or weapons in the jail. Partially obstructing a jailer's view with a curtain or partition would interfere with this objective. Additionally, the City's utilization of a partition or curtain might address inmate privacy concerns, but it would do nothing to overcome the plain language of the regulation, which requires visual observation by a jailer of the same sex. With or without a partition, Rucker is not "of the same sex" as any of the jail inmates.[16] The Court also finds unconvincing Rucker's argument that male inmates could be detained in their street clothes until a male jailer arrived on duty. Ohio Admin.Code § 5120:1–10–01(L)(10) contemplates new inmates changing into jail attire before being integrated into the jail population. In order to comply with the regulation's

---

**16.** Parenthetically, the Court notes that at the Dayton Correctional Institution, which *did* allow inmates to change clothes behind a curtain, Rucker was not allowed to stand outside the curtain by herself when a male inmate changed. She testified that, with the exception of emergency situations, a male officer was required to be present to observe the change of clothing.

visual observation requirement, the City would be forced to keep new arrestees segregated from the jail population and in their street clothes, possibly for many hours, until a male jailer arrived on duty.[17] The Court is not persuaded that such an alternative is a reasonable one. Allowing arrestees to remain in their street clothes would increase the danger of contraband and/or weapons being secreted and smuggled into the jail. As noted, *supra,* the "essential nature" of the Kettering jail "is to lodge, keep, transport, feed and care for prisoners." *Reed,* 184 F.3d at 599. As the sole jailer on duty, however, Rucker could not properly "lodge" and "keep" a new inmate, who must be observed changing into jail clothing. Rather, she regularly would be required to forego proper "lodging" and "keeping" until a male jailer arrived to perform the necessary components of those tasks.[18]

Based upon the foregoing analysis, the Court concludes that the City *cannot* comply with Ohio law and hire Rucker as a civilian jailer, inasmuch as O.A.C. § 5120:1–10–01(L)(10) requires visual observation by same-sex jailers when inmates change their clothing.[19] Given that the Kettering facility does not house female inmates, and that the jailers usually work one-person shifts, the City's rejection of Rucker as a candidate for employment is reasonably necessary to the proper and lawful functioning of its five-day holding facility. *Cf. Reed,* 184 F.3d at 599–600 (reasoning that the reassignment of a female jailer to third-shift was justified as a BFOQ, in light of a state regulation which required a female jailer to be present whenever women were lodged in the jail). In short, Rucker's gender is "manifestly related" to the City's ability to lodge inmates in compliance with state law. *Id.* at 600. Thus, insofar as Rucker rests her Fourteenth Amendment equal protection claim upon a BFOQ analysis, the Court concludes that the City's gender-based hiring policy *does* qualify as a BFOQ.[20]

In opposition to this conclusion, Rucker argues, in largely conclusory fashion, that any provision of the Ohio Administrative Code which precludes her employment as a civilian jailer is unenforceable, because it violates state and federal statutory law. Specifically, Rucker contends that the Code provisions conflict with 42 U.S.C. § 1983 and Ohio Rev.Code § 4112.02, to the extent that they bar women from working as civilian jailers. With respect to her § 1983 claim, Rucker apparently contends, without any supporting constitutional analysis, that portions of the Ohio Administrative Code violate the Equal Protection Clause of the Fourteenth Amendment. It is well-settled, however, that federal courts are not quick to declare state statutes unconstitutional, as state legislation is entitled to a presumption of constitutionality. *See Aronson v. City of*

---

17. If the City opened the civilian jailer application process to women, any number of the jailers ultimately might be female, resulting in a wait of not just one shift for a male jailer to arrive, but possibly several shifts.

18. Supervisor Craig Bailey testified that jail inmates "dress out" into City-issued clothing approximately five to seven times per week.

19. Based upon the analysis set forth above, the Court is unconvinced, however, that anything contained in O.A.C. § 5120:1–10–01(L)(4) and O.A.C. § 5120:1–10–03(V), the other Ohio Administrative Code regulations discussed, prevents the City from hiring Rucker.

20. In a larger facility, regulations such as O.A.C. § 5120:1–10–01(L)(10) would not operate to exclude women from working as jailers, because work assignments and schedules could be arranged to accommodate the employment of female jailers, without jeopardizing compliance with state law. Given the small staff at the Kettering facility, however, and the fact that it houses only male inmates, the City appears to be unable to comply with the "visual observation" requirement of the Ohio Administrative Code *and* to hire Rucker as a civilian jailer. With few exceptions, the jailers at the City's facility work one-person shifts. Consequently, "[t]here is no doubt that [Rucker's] gender [is] manifestly related to the jail's ability to lodge ... [male] prisoners in compliance with state law." *Reed,* 184 F.3d at 600.

*Akron,* 116 F.3d 804, 809 (6th Cir.1997) ("Legislative enactments carry a strong presumption of constitutionality.... Rebutting the presumption is seldom easy, and it is far from easy here."). The same strong presumption of constitutionality applies to the provisions of the Ohio Administrative Code. *Roosevelt Properties Co. v. Kinney,* 12 Ohio St.3d 7, 13, 465 N.E.2d 421, 427 (1984) (recognizing that courts accord legislatively authorized administrative regulations a strong presumption of constitutionality). Despite this presumption of constitutionality, Rucker fails to present any substantive argument concerning the alleged unconstitutionality of the Ohio Administrative Code provisions at issue. Indeed, Rucker argues only that sex is not a BFOQ for the civilian jailer position at issue. She does not address whether the pertinent Ohio Administrative Code provisions violate the Equal Protection Clause of the Constitution. Consequently, the Court concludes that Rucker has not demonstrated a likelihood of success on the merits of her claim under 42 U.S.C. § 1983. Specifically, Rucker has not established a likelihood of success with respect to her allegation that the City has violated her Fifth, Ninth, and Fourteenth Amendment rights.[21]

Finally, insofar as Rucker alleges that the Ohio Administrative Code provisions at issue are unenforceable because they conflict with Ohio Rev.Code § 4112.02(A), such an argument has no bearing on her 42 U.S.C. § 1983 claim. As noted above, in order to prevail under § 1983, Rucker must establish a violation of her rights under the Constitution, not § 4112.02. Furthermore, Rucker has not demonstrated that any of the Ohio Administrative Code provisions actually conflict with Ohio Rev.Code § 4112.02(A). Based upon the analysis set forth, *supra,* the only Administrative Code provision that might conflict with § 4112.02 is O.A.C. § 5120:1–10–

01(L)(10), which requires a jailer of the same sex to observe a new inmate changing his or her clothes. Notably, however, this regulation does not prohibit five-day holding facilities from hiring female jailers to guard male inmates. Nor does it prohibit such facilities from hiring male jailers to guard female inmates. In short, nothing in O.A.C. § 5120:1–10–01(L)(10) mandates sex discrimination with respect to hiring decisions. Thus, the regulation does not appear to conflict with Ohio Rev. Code § 4112.02, which prohibits, *inter alia,* sex discrimination in employment decisions. What the administrative regulation does do, however, is force the City have same-sex jailers available to supervise clothing changes. That requirement creates a problem in the present case only because (1) the City's facility houses no women and (2) unlike larger facilities, the jail is staffed too thinly to permit Rucker to work alongside a male jailer who could observe the required clothing change. In the Court's view, however, O.A.C. § 5120:1–10–01(L)(10) is comparable to the Kentucky regulation in *Reed,* which required a female jailer to be present when female inmates were lodged in the county jail. *Reed,* 184 F.3d at 598. In *Reed,* the Sixth Circuit held that the Kentucky regulation established a valid BFOQ for the jailer position at issue. Similarly, in the present case, the Ohio Administrative Code establishes a valid BFOQ for the available position at the City's five-day holding facility. As set forth more fully, *infra,* the Ohio Supreme Court has recognized that a BFOQ is a valid defense to a claim of discrimination under Ohio Rev. Code § 4112.02. *Little Forest Med. Center v. Ohio Civil Rights Comm.,* 61 Ohio St.3d 607, 575 N.E.2d 1164 (1991).

### 2.  *Ohio Rev.Code § 4112.02 (Count II)*

In Count II of her amended Complaint, Rucker alleges that her exclusion from the

---

**21.**  Given Rucker's failure to demonstrate a probable violation of her constitutional rights, the Court need not determine whether she is likely to satisfy the other requirements of her § 1983 claim. The Court notes, however,

that the City has not disputed Rucker's ability to satisfy the requirements for municipal liability set forth in *Monell v. New York Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

civilian jailer application process violates Ohio Rev.Code § 4112.02. Upon review, the Court finds this argument unpersuasive. Although Rucker's amended Complaint fails to identify the portion of § 4112.02 upon which she relies, her gender-discrimination claim potentially implicates both § 4112.02(A) and § 4112.02(E)(5). The former provision states that it is unlawful for any employer to refuse to hire a person because of that person's gender. The latter provision makes it an unlawful discriminatory practice for any employer, prior to employment, to announce or follow a policy of denying employment opportunities to any group because of the sex of that group. On their face, both provisions appear to prohibit the City from denying Rucker the opportunity to apply for the civilian jailer position. In *Little Forest Med. Center v. Ohio Civil Rights Comm.*, 61 Ohio St.3d 607, 575 N.E.2d 1164 (1991), however, the Ohio Supreme Court construed § 4112.02(A) as including a BFOQ exception identical to the Title VII BFOQ exception discussed herein. Given the Court's determination, *supra*, that gender appears to be a legitimate BFOQ for the civilian jailer position under federal law, the Ohio Supreme Court's ruling in *Little Forest* mandates the same result under § 4112.02(A). Finally, the express language of § 4112.02(E)(5) appears to preclude a finding of liability against the City under that section, which prohibits sex discrimination in hiring, "except where based on a bona fide occupational qualification certified in advance by the [Ohio Civil Rights] [C]ommission." In the present case, however, the City *did* obtain advance BFOQ certification by the Ohio Civil Rights Commission for the civilian jailer position. Consequently, the City appears to escape liability under § 4112.02(A) and § 4112.02(E)(5). Therefore, Rucker has not demonstrated a substantial likelihood of success on the merits of her state-law claim. Based upon the foregoing analysis, the Court concludes that first factor in its four-part analysis, likelihood of success on the merits, weighs in favor of the City.

### B. *Irreparable Harm*

The second factor for the Court's consideration is whether Rucker will suffer irreparable harm without the issuance of a preliminary injunction. In opposition to such a conclusion, the City argues that the hiring process for its civilian jailers is lengthy, and that "there is absolutely no evidence before this Court that if an injunction is issued, Plaintiff will satisfy all of the other requirements for the position of civilian jailer." (Doc. # 11 at 10). The Court does not dispute that, in the end, Rucker may fail to be selected for the civilian jailer position, even with the issuance of a preliminary injunction. The problem with the City's argument, however, is that her failure is an absolute certainty in light of its refusal to accept her employment application. By refusing Rucker's application, the City has foreclosed her opportunity even to compete for the present job opening.

In her post-hearing Memorandum, Rucker argues that the deprivation of a constitutional right constitutes per se irreparable harm. She also contends that irreparable harm exists because the City may fill the available jailer position while her lawsuit is pending. (Doc. # 7 at 5). Upon review, the Court finds Rucker's first argument unpersuasive. In support of her contention that per se irreparable harm exists, Rucker relies solely upon case law involving alleged violations of an individual's First Amendment rights. Infringement upon First Amendment rights does indeed result in irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 353, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *see also United Food & Commercial Workers Union v. Southwest Ohio Regional Transit Auth.*, 163 F.3d 341, 363 (6th Cir.1998), citing *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir.1989), for the proposition that "even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief." In the present case, however, Rucker has alleged a violation of 42 U.S.C.

§ 1983, via the Fourteenth Amendment, and a violation of Ohio Rev.Code § 4112.02. She cites nothing to suggest that a violation of these provisions necessarily results in irreparable harm, and the Court has found nothing to support her assertion.

■ With respect to Rucker's second argument, however, the Court agrees that she likely will suffer irreparable harm if the City is not enjoined from permanently filling the existing civilian jailer vacancy.[22] In *N.A.A.C.P. v. City of Mansfield, Ohio*, 866 F.2d 162 (6th Cir.1989), the Sixth Circuit recognized that the filling of a vacancy within a city fire department may irreparably harm a plaintiff who wishes to be hired for the position. *Id.* at 171 n. 6; *see also Ashton v. City of Memphis*, 105 F.3d 659, 1996 WL 748163 (6th Cir. Dec.30, 1996) ("[M]any of the officers bringing suit may be irreparably harmed if the Department conducts another round of promotions.... There is every reason to believe that all of the positions will be filled by the time the district court [resolves the lawsuit].").  In the present case, the potential for irreparable harm is particularly high.  The City employs only five civilian jailers.  Consequently, if the current opening is filled, Rucker may be unable to obtain a job as a jailer for quite some time, even if she prevails on her lawsuit.  The infrequency of vacancies for government employment can constitute irreparable harm. *N.A.A.C.P. v. Town of East Haven*, 70 F.3d 219, 224 (2nd Cir.1995). Furthermore, if the City fills the current vacancy and Rucker ultimately prevails on her lawsuit, any award of relief "would be complicated indeed." *Id.*, citing *Firefighters Institute for Racial Equality v. City of St. Louis*, 616 F.2d 350, 362 (8th Cir.1980). For the foregoing reasons, the Court concludes that Rucker has demonstrated a likelihood of irreparable harm absent the

issuance of a preliminary injunction.  Consequently, this factor weighs in favor of the Court issuing a preliminary injunction.

### C.  *Harm to Others*

The third factor for the Court's consideration is the probability that granting a preliminary injunction will cause substantial harm to others.[23]  In her post-hearing Memorandum, Rucker suggests that "inconvenience" will be the only harm to the City if an injunction is granted.  The Court finds Rucker's argument unpersuasive.  Although the City has completely failed to address this branch of the four-part inquiry, the Court notes that the issuance of a preliminary injunction would harm the City after December 1, 1999, when one of its five civilian jailers retires.  That retirement would result in either under-staffing of the jail or substantial overtime demands being placed upon the remaining four jailers.  On the other hand, the record reflects that Kettering's jail is the only five-day holding facility in the Dayton area and possibly in the state of Ohio. As a result, the Court's failure to issue a preliminary injunction will cause Rucker to lose a unique employment opportunity, at least temporarily.  Rucker has presented no evidence, however, suggesting that other jailer jobs are unavailable (or are unlikely to become available soon) in the greater Dayton area.  After weighing the equities (i.e., balancing the harm to Rucker if a preliminary injunction is denied and the harm to the City if preliminary injunction is granted), the Court concludes that the competing interests militate slightly in favor of the City.

### D.  *Public Interest*

The final factor in the Court's analysis is whether the public interest is advanced by the issuance of the preliminary injunction.

---

**22.**  As noted, *supra,* the Court has allowed the City to fill the vacancy on a temporary, emergency basis.  (*See* TRO, Doc. # 5).

**23.**  As noted, *supra,* with this factor the Court balances the equities by weighing the harm

that Rucker will suffer in the absence of an injunction against the harm which will befall the City if an injunction is granted.  *See Southern Ohio Coal Co. v. United Mine Workers of America*, 551 F.2d 695 (6th Cir.1977).

This factor weighs equally in favor of Rucker and the City. It is certainly in the public interest to hire law enforcement officials when a vacancy arises. *Cf. N.A.A.C.P. v. Town of New Haven,* 70 F.3d at 223. The public interest in filling the City's civilian jailer position is evident in the present case. The retirement of a jailer presumably would result in the remaining four jailers working substantial overtime, in order to staff the facility twenty-four hours a day, seven days a week.[24] On the other hand, the public interest undeniably favors equal employment opportunities for women such as Rucker. As noted above, if the City fills its vacancy, Rucker may be unable to obtain a civilian jailer job even if she prevails in her lawsuit. After weighing these competing public interests, the Court concludes that they are in equipoise. Consequently, this factor does not weigh in favor of either party.

III. *Conclusion*

On the whole, after balancing the aforementioned four factors, the Court concludes that the Plaintiff has not demonstrated her entitlement to a preliminary injunction. Accordingly, based upon reasoning and citation to authority set forth above, the Plaintiff's Motion for a Preliminary Injunction (Doc. # 2) is OVERRULED.

---

**24.** As noted above, the Court has temporarily alleviated this concern by allowing the City to acquire civilian jailer services on an emergency basis.